671 A.2d 744

**Robert J. ALLWEIN, Administrator C.T.A. of the Estate of Michael A. Allwein, Deceased**

**v.**

**DONEGAL MUTUAL INSURANCE COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 1, 1995.

Filed Feb. 20, 1996.

Harry W. Reed, Jr., Lebanon, for appellant.

James Ronca, Harrisburg, for appellee.

Leonard A. Sloane, Media, amicus curiae.

Before ROWLEY, President Judge, and McEWEN, CIRILLO, DEL SOLE, BECK, TAMILIA, POPOVICH, FORD ELLIOTT, and SAYLOR, JJ.

FORD ELLIOTT, Judge:

This is an appeal from the order entered July 27, 1994, denying appellant's petition to modify or correct an arbitration award. We affirm. A brief review of the factual and procedural history of the case, taken from the trial court opinion, follows.

On August 13, 1992, Michael A. Allwein was riding his bicycle to work when he was struck by a vehicle operated by Jeremiah Lauver. Michael Allwein died as a result of injuries suffered during the accident.

The vehicle operated by Jeremiah Lauver and owned by Henry Lauver was insured by the self-insured Eastern Pennsylvania Mennonite Church. The vehicle carried $15,000/$30,000 in automobile liability insurance coverage.

At the time of the accident, Michael Allwein resided with his parents, James H. Allwein and Christine M. Allwein. The Allweins' [sic] owned three vehicles insured with automobile insurance issued by Donegal Mutual Insurance Company (Donegal). This policy provided underinsurance coverage of $35,000 per vehicle and allowed stacking of the

coverages for a total underinsured motorist liability coverage of $105,000.

Both Donegal and Robert J. Allwein, Administrator C.T.A. of the Estate of Michael A. Allwein, Deceased, [decedent] . . . admit the value of the loss experienced by Allwein because of the death of [decedent] exceeds the $15,000 liability limits of the party at fault, the operator Jeremiah Lauver and the owner Henry Lauver, and the $105,000 underinsurance liability of Donegal.

Allwein filed a claim against Donegal seeking payment of underinsurance benefits in the amount of $105,000. Donegal has admitted its obligation to pay underinsurance benefits but has taken the position that it owes only $90,000 in underinsurance benefits because it may offset the amount it owes by the $15,000 of liability insurance benefits from the Lauvers' policy. Donegal bases its position on the following limiting language found in its policy:

C. The limit of liability shall be reduced by all sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible. This includes all sums paid for an 'insured's' attorney either directly or as part of the amount paid to the 'insured.' It also includes all sums paid for the same damages under Part A. of this policy.

*See* Exhibit A of Exhibit 1 of the Petition, Form PPD 04 19 3/92, page 2 of 3.

Trial court opinion, 7/25/94 at 1–3.

Pursuant to the terms of the insurance policy, any disputes between the parties were to be resolved through arbitration in accordance with the Pennsylvania Arbitration Act of 1927. As a result, the parties submitted their dispute to a panel of arbitrators. By a two-to-one vote, the arbitrators found that Allwein was entitled to the full $105,000 from Donegal. Donegal then appealed the arbitrators' award to the trial court. Both parties agree that 42 Pa.C.S.A. § 7302(d)(2) sets forth the proper standard of review of an arbitrators' award under the 1927 Act. Section 7302(d)(2) provides:

> Where this paragraph is applicable a court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict.

42 Pa.C.S.A. § 7302(d)(2). *See* appellee's brief at 15; appellant's brief at 36.

The trial court was presented with a single issue; namely, "whether the cited language in Donegal's policy is valid or whether Donegal owes Allwein an additional $15,000 in underinsurance benefits." (Trial court opinion, 7/25/94 at 3.) In its well-reasoned opinion, the trial court found the so-called "gap" provision in Donegal's policy, cited *supra*, which allowed Donegal to offset the underinsurance benefits payable to Allwein against liability payments received pursuant to the tortfeasor's separate policy, to be violative of the public policy of Pennsylvania.

In its appeal from the trial court order affirming the arbitrators' award, Donegal raises five issues.[1] The first four issues merely divide into four arguments the larger issue raised below. They are:

A. Whether the 1990 amendment to Section 1731(a) of the MVFRL [Motor Vehicle Financial Responsibility Law], making underinsured motorist coverage optional, eliminates any argument that gap underinsured coverage violates public policy.

B. Whether vague notions of public policy can be used to invalidate unambiguous insurance policy provisions.

C. Whether an automobile insurance policy's 'gap' UIM [underinsured motorist] coverage is consistent with the express insurance cost reduction and coverage balancing public policy goals of MVFRL.

---

1. Because the parties agree on the correct standard of review, we need not address appellant's issue number five, which posits 42 Pa.C.S.A. § 7302(d)(2) as the correct standard.

D. Whether the required 'offer' of underinsured motorist coverage under Section 1731(a) and the definition of 'underinsured motor vehicle' in Section 1702 prohibit gap underinsured motorist coverage under the MVFRL.

Appellant's brief at 2. In addition to appellant's counsel's brief, The Pennsylvania Defense Institute (PDI) has filed an *amicus curiae* brief on behalf of appellant.[2] We shall adopt the structure of the PDI's argument section to address appellant's arguments. As a result, we shall address appellant's fourth argument first.

## STATUTORY LANGUAGE

The PDI argues that "The unambiguous language of 75 Pa.C.S.A. Section 1702 ... merely defines what an underinsured motor vehicle is and does not make any attempt to define what underinsured motorist 'coverage' should be in Pennsylvania." (PDI brief at 7.) As a result, appellant argues that gap insurance provisions are not violative of the law or public policy of Pennsylvania. Before addressing this issue, a brief exegesis on the two forms of underinsurance coverage in dispute will be helpful.

"Excess" underinsurance benefits are limited only by the victim's damages or the policy limits, whichever is smaller. As the trial court stated:

Under excess coverage, the party at fault is underinsured when his liability limits are less than the insured victim's total damages. The tortfeasor's policy acts as primary coverage, and the insured victim's policy acts as secondary coverage. The victim recovers under the tortfeasor's policy up to the policy limits and then recovers under his own policy up to coverage limits or up to the total amount of damages, whichever is less.

Trial court opinion, 7/25/94 at 4. Under excess coverage, therefore, appellee would be entitled to recover the full $105,-

---

2. The Pennsylvania Trial Lawyers Association (PATLA) has also filed an *amicus* brief, on behalf of the Allweins.

000 of underinsurance benefits available under his policy, because the parties agree that the total amount of his damages exceeds the combined benefits available under both the tortfeasors' policy limits and appellee's underinsurance benefits.

Under "gap" insurance, on the other hand:

[T]he party at fault is underinsured when [his or her] liability limits are less than a specified policy limit of the insured victim. To determine the amount of the insured's underinsurance recovery, the recovery from the tortfeasor's policy is deducted from the amount recoverable under the insured's [underinsurance] policy. The insured's recovery fills the gap between the two policies up to the total amount of damages suffered or [up to the] policy limits, whichever is less.

Trial court opinion, 7/25/94 at 4. As a result, appellee in the instant case would only be entitled to benefits in the amount of the "gap" between the $15,000 of coverage under the tortfeasors' policy and the $105,000 limits of liability of underinsurance under his own policy; namely, $90,000. Furthermore, under gap insurance, if a tortfeasor's liability coverage is greater than the underinsurance coverage carried by the victim, the victim would be entitled to zero underinsurance recovery, even where his or her damages are far in excess of the tortfeasor's liability limits. For example, in the instant case, if the tortfeasors had carried $150,000 of liability insurance instead of $15,000, and appellee's damages were determined to be $500,000, appellee would recover nothing from Donegal because appellee's "gap" underinsurance benefits of $105,000 would be less than the tortfeasors' liability coverage, so that there would be no gap to fill.

Having compared the two types of underinsurance at issue instantly, we turn next to the definition of underinsurance contained in the MVFRL. This definition has not changed since the MVFRL was enacted in 1984. Section 1702 defines an underinsured motor vehicle as "A motor vehicle for which the limits of available liability insurance and self-insurance are insufficient to pay losses and damages." 75 Pa.

C.S.A. § 1702. Thus, the statute defines underinsured coverage in terms of the damages sustained by plaintiff. Appellant, however, argues that this statutory language does not address the issue of coverage; instead, appellant argues that § 1702 merely defines an underinsured "vehicle." We find a major flaw in this analysis.

As noted *supra,* under a gap underinsurance policy, a tortfeasor's vehicle would not be an underinsured vehicle if the tortfeasor's liability limits were greater than or equal to the victim's underinsurance benefits, *regardless of the victim's losses and damages.* The result under gap insurance, therefore, is that the victim of a negligent driver whose liability insurance is not adequate to indemnify the victim for losses and damages would receive *no* underinsurance from his or her own policy if the tortfeasor's liability insurance were greater than or equal to the victim's underinsurance benefit. *See Fisher v. USAA Casualty Insurance Co.,* 973 F.2d 1103, 1108 (3d Cir.1992); *Ober v. Aetna Casualty and Surety Co.,* 766 F.Supp. 342, 347–48 (W.D.Pa.1990), *affirmed,* 944 F.2d 898 (3d Cir.1991); *Schemberg v. Progressive Casualty Insurance Co.,* 709 F.Supp. 620 (E.D.Pa.1989). Such a result is directly at odds with the statutory language, which defines an underinsured vehicle as one for which the tortfeasor's liability limits are *less than the victim's losses and damages.*

Further support for the proposition that § 1702 is worded so as to require excess underinsurance coverage is found in Alan I. Widiss, Uninsured and Underinsured Motorist Insurance § 35.2 (2d ed. 1995). As Widiss notes:

Statutes in several states provide that the underinsured motorist insurance applies whenever the damages (or in some instances, the 'injuries') sustained by an insured exceed the coverage limit of the tortfeasor's liability insurance. Thus, the determination in these states is based on a comparison of the damages (or injuries) sustained by the claimant to the applicable coverage limit of the tortfeasor's liability insurance.

*Id.* at 140. Widiss then cites a typical statutory provision of this type:

An underinsured motorist is the owner or operator of a motor vehicle who carries automobile liability insurance with coverage in an amount *less than the amount of damages* that persons insured pursuant to [the applicable financial responsibility statute] are legally entitled to recover because of bodily injury, sickness or disease, including death resulting therefrom.

*Id.* (emphasis in original). Widiss then lists those jurisdictions, including Pennsylvania,[3] which have this type of insurance.

Another insurance treatise focusing on the Pennsylvania MVFRL offers the following characteristics of statutes requiring "excess" coverage:

(1) They define an 'underinsured' motor *vehicle* as one whose coverage is less than the insured's damages (or the amount the insured is entitled to recover.)

(2) They do not contain any explicit limitation on recovery except that the tortfeasor's payments plus the underinsured motorist carrier's payments may not exceed total damages.

James R. Ronca, *et al.,* Pennsylvania Motor Vehicle Insurance—An Analysis of the Financial Responsibility Law § 8.2 (1986) (emphasis added).[4] The language of § 1702 clearly falls within this description.

In addition to our own independent analysis of the language of § 1702, we also find that courts of other jurisdictions interpreting § 1702 have construed it to require excess underinsurance coverage. The Vermont supreme court, for example, opined that "Pennsylvania is an example of an excess coverage state...." *Webb v. Fidelity & Guaranty Co.,* 158 Vt. 137, 143, 605 A.2d 1344, 1347 (1992), *citing* § 1702. Federal courts construing § 1702 have also found it to require excess underinsurance coverage. *See, for example, Fisher,*

3. Widiss cites 75 Pa.C.S.A. § 1732, repealed by the 1990 amendments; however, the language cited is identical to the language of the current § 1702.

4. While we recognize that Mr. Ronca, one of the co-authors of the cited treatise, entered his appearance on behalf of appellee in the instant case, we cite the treatise as a useful guide to the Pennsylvania MVFRL.

*supra* at 1108; *North River Insurance Co. v. Tabor,* 934 F.2d 461 (3d Cir.1991), discussed more fully below; *Ober, supra* at 347–48; *Schemberg, supra* at 622. *See also* Ronca, *supra* at § 8.2 n. 5, observing that the Pennsylvania Insurance Department's Guidelines provide, as their example of underinsured coverage, a clear instance of excess coverage; the injured insured with underinsurance coverage of $50,000 and damages of $150,000 should recover from his underinsurance carrier the full $50,000, [not $15,000], where the tortfeasor's liability insurance provides only $35,000 in coverage. *Id., citing* Insurance Department Guidelines, C–1, in Appendix C–2.

We find further support for our view that the plain language of § 1702 defines underinsurance coverage in "excess" terms from prior decisions of this court. In *Davis v. Erie Insurance Group,* 400 Pa.Super. 345, 583 A.2d 819 (1990), *allocatur denied,* 528 Pa. 610, 596 A.2d 157 (1991), for example, this court was asked to determine whether a provision of the newly enacted MVFRL mandating underinsurance was incorporated into a pre-existing no-fault policy by virtue of a "liberalization" clause in that policy which stated that the insurer would give the insured the benefit of any broadening of the policy that did not require an additional premium. In holding that the underinsurance premium of the MVFRL was so incorporated, this court also stated that underinsurance under the MVFRL "means *in addition to* the limits of liability by policies covering the accident to the extent of the damages ... [The insurer's] position on 'gap' coverage [that the policy may only provide gap coverage] is, therefore, not sustainable." *Id.* at 352, 583 A.2d at 823 (emphasis in original).[5]

Finally, we find support for our conclusion that § 1702 was written to require excess underinsurance coverage from other

**5.** Because the MVFRL only mandated a statutory minimum of $15,000/ $30,000 underinsurance coverage, and because the court was reading into a no-fault contract a legislatively mandated underinsurance provision in accord with the MVFRL and the liberalization clause in the contract, the court refused to read into the contract more than the statutory minimum amount of excess underinsurance coverage in view of the language in the contract providing that the policy would only be broadened to provide the insured with benefits that did not require additional premiums.

jurisdictions in which the same or similar statutory language has been determined to require excess coverage. *See* Ronca, *supra* at § 8.2 n. 7, *citing* Louisiana Rev.Stat.Ann. § 22:1406(D)(2)(b) (West 1983) ("For purposes of this coverage the term uninsured [sic] motor *vehicle* shall ... be deemed to include an insured motor vehicle when the automobile liability insurance coverage on such vehicle is less than the amount of damages suffered by an insured and/or the passengers in the insured's vehicle at the time of an accident...."); Washington Rev.Code Ann. § 48.22.030(1) (1984) (" 'Underinsured motor *vehicle* ' means a motor vehicle ... with respect to which the sum of the limits of liability under all bodily injury or property damage liability bonds and insurance policies applicable to a covered person after an accident is less than the applicable damages which the covered person is legally entitled to recover."); Arizona Rev.Stat.Ann. § 20.259.01(E) (1984) (" 'Underinsurance motorist coverage' includes coverage for a person if the sum of the limits of liability under all bodily injury or death liability bonds and liability insurance policies applicable at the time of the accident is less than the total damages for bodily injury or death resulting from the accident.") (emphasis added).[6]

Appellant argues that some other jurisdictions requiring excess coverage, while perhaps using language similar to

**6.** Appellant has cited one jurisdiction in which the statutory language is similar to the language in § 1702, and in which the court allegedly "enforced [a] gap underinsured provision[ ] when [it was] written in a clear and unambiguous fashion." (PDI brief at 14, *citing Griffin v. Battles,* 656 So.2d 1221 (Ala.Civ.App.1995)). We have reviewed *Griffin,* a case in which the trial court allowed the *tortfeasor* a beneficial set-off, but the Court of Civil Appeals reversed, noting in dicta that while certain types of set-offs, such as set-offs for medical payment coverage and uninsured motorist coverage may be allowed to insurers, they are not allowed to tortfeasors: "[W]hile set-off may be claimed by [plaintiff's] insurer by virtue of an express provision in its policy, that set-off is not available to ... the tort-feasor...." *Id.* at 1225. For several reasons, we find appellant's citation to *Griffin* unpersuasive. First, as noted, the court only addressed the set-off issue in dicta. Second, three judges out of an unspecified number in the *Griffin* panel concurred. Finally, the intent of the Alabama Legislature in enacting its financial responsibility law is not discussed.

Pennsylvania's § 1702, "have specifically indicated that there is an explicit limitation that clearly, concisely and unambiguously states that the coverage will be excess and that a payment by the tort feasor [sic] 'shall not reduce' the underinsured motorist coverage." (PDI brief at 16, *citing* Nevada, Oklahoma, South Carolina, Utah, and West Virginia law.) This may be true; however, it may merely be an attempt on the part of those states to circumvent the rising tide of litigation, with its concomitant "waste of policyholder's money and the court's time," that often surrounds any amendment or revision to a statutory provision. *See* Robert E. Keeton, *et al.,* Insurance Law, a Guide to Fundamental Principles, Legal Doctrines and Commercial Practices § 3.11 n. 4 (1988), *quoting Schoenecker v. Haines,* 88 Wis.2d 665, 675, 277 N.W.2d 782, 786–87 (1979).[7]

## STATUTORY INTERPRETATION

Appellant next argues that § 1702 must be interpreted with an eye toward the legislative intent behind the MVFRL. *See* 1 Pa.C.S.A. § 1921. As PATLA observes in its brief, however, " '[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.' " PATLA brief at 7, *quoting* 1 Pa.C.S.A. § 1921(b). While we find that the words of the statute are clear, we shall nevertheless address appellant's argument.

■ Our supreme court, in *Windrim v. Nationwide Insurance Co.,* 537 Pa. 129, 641 A.2d 1154 (1994), recently adopted the analysis set forth by this court in *Allen v. Erie Insurance Co.,* 369 Pa.Super. 6, 534 A.2d 839 (1987), regarding the Legislature's intent when enacting the MVFRL:

'In passing the [MVFRL], the Legislature was primarily concerned with the rising consumer cost of automobile insurance, created in part by the substantial number of

---

7. We recognize that the context in which the *Schoenecker* court made the comment noted *supra* differs from the situation instantly; however, the rationale behind the comment is apposite.

uninsured motorists who contributed nothing to the pool of insurance funds from which claims were paid. The [MVFRL] has the effect of requiring all owners of registered vehicles to share in the burden of insurance before they can obtain the benefits. By denying benefits to a certain class of people—those not insuring their registered vehicles—the [MVFRL] encourages the purchase of insurance by all owners who register vehicles which can be legally operated on the highways.'

*Windrim, supra* at 134, 641 A.2d at 1157, *quoting Allen, supra* at 10, 534 A.2d at 840–41 (other citations omitted). Thus, as appellant argues, a major goal of the MVFRL was cost reduction.

The problem with appellant's analysis, however, is that it places the cart before the horse. As Judge Lee stated in *Ober, supra:*

[T]he appellate courts of Pennsylvania have held that the 'purpose of the uninsured motorist law has been frequently interpreted by our courts as providing protection to the innocent victims of uninsured drivers,' *Boyle v. State Farm Mut. Auto. Ins. Co.,* 310 Pa.Super. 10, 21, 456 A.2d 156, 162 (1983), and that the statutes have been 'designed to give monetary protection to that . . . large group of persons who . . . suffer grave injuries through negligent use of those highways by others.' *See Harleysville Mut. Cas. Co. v. Blumling,* 429 Pa. 389, 395, 241 A.2d 112, 115 (1968). . . .

*Ober, supra* at 346. Recently, in the context of underinsurance coverage, this court reaffirmed that one of the objects of the MVFRL was to afford:

the injured claimant the greatest possible coverage. *Danko [v. Erie Insurance Exchange,* 428 Pa.Super. 223, 630 A.2d 1219 (1993), *affirmed,* 538 Pa. 572, 649 A.2d 935 (1994) ]; *Sturkie v. Erie Insurance Group,* 407 Pa.Super. 117, 595 A.2d 152 (1991); *Lambert [v. McClure,* 407 Pa.Super. 257, 595 A.2d 629 (1991) ]. In close or doubtful cases, we must interpret the intent of the legislature and the language of insurance policies to favor coverage for the insured. *Danko, supra; Lambert, supra.*

*Motorists Ins. Companies v. Emig,* 444 Pa.Super. 524, 538, 664 A.2d 559, 566 (1995). The *Emig* court's analysis was based in part upon 1 Pa.C.S.A. § 1928(c), which provides that "All other provisions [excluding those delineated in § 1928(b), to which strict construction applies] of a statute shall be liberally construed to effect their objects and to promote justice." *Emig, supra* at 538, 664 A.2d at 566.

■ Appellant argues, and we agree, that courts addressing the policy behind the MVFRL have recognized a shift in policy since the days of no-fault insurance. As an *en banc* panel of this court stated, "We disagree ... that our responsibility to 'liberally construe' the UMCA and the MVFRL is as broad a judicial mandate to effectuate coverage as was the 'maximum feasible restoration' principle in the now defunct No–Fault Act." *Jeffrey v. Erie Insurance Exchange,* 423 Pa.Super. 483, 495 n. 5, 621 A.2d 635, 641 n. 5 (1993) (*en banc* ), *allocatur denied,* 537 Pa. 651, 644 A.2d 736 (1994). *Accord Frazier v. State Farm Mutual Automobile Insurance Co.,* 445 Pa.Super. 218, 220–21, 665 A.2d 1, 2 (1995). Nevertheless, because the clear language of § 1702 indicates the Legislature's intent to define underinsurance in "excess" terms, we do not even need to liberally construe the statute to determine that underinsurance in Pennsylvania is to be excess insurance. Furthermore, while "maximum feasible restoration" may have passed out of favor, the basic theory behind automobile insurance surely has not. The policy of liberally construing the MVFRL is based upon the policy of indemnifying victims of accidents for harm they suffer on Pennsylvania highways. *See* Keeton, *supra* at § 3.1. *See also Pennsylvania Financial Responsibility Assigned Claims Plan v. English,* 541 Pa. 424, 431, 664 A.2d 84, 87 (1995) ("It is also presumed that the Legislature intends to favor the public interest as opposed to any private interest. *See generally* 1 Pa.C.S. § 1922."). As Judge Lee stated in *Ober,* "Underinsurance coverage only makes sense if such amount is set-off against the total actual damages suffered by plaintiff. To allow set-off against his underinsurance coverage renders such coverage a nullity." *Ober, supra* at 348.

Appellant's emphasis on cost-control is, therefore, misplaced. While it is true that the MVFRL was concerned with the spiralling costs of automobile insurance under the then-existing no-fault laws, the reason for the concern was the increasing number of uninsured and underinsured drivers on the highways, and the resultant inability of those drivers to indemnify their victims for losses and damages sustained as a result of their negligence. *See Windrim, supra.* The goal of reducing costs was, therefore, tied to the broader goal of indemnification. Because we disagree with appellant's conclusion that the intent of the Legislature requires us to read § 1702 as permitting gap underinsurance coverage, we turn to appellant's next argument; namely, that the language of the insurance policy itself mandates such a result.

## INSURANCE POLICY LANGUAGE

■ According to appellant, this court must give effect to the language contained in its policy of insurance where that language is clear and unambiguous. (PDI brief at 20.) In support of this proposition, appellant cites *Bateman v. Motorists Mutual Ins. Co.,* 527 Pa. 241, 590 A.2d 281 (1991), and *Votedian v. General Accident Fire & Life Assurance Corp.,* 330 Pa.Super. 13, 478 A.2d 1324 (1984). In *Bateman,* our supreme court, relying on *Votedian,* held that the intent of the parties to a contract of insurance controlled, and that where the language was clear and unambiguous, the terms of the contract would be enforced. *Bateman, supra* at 245, 590 A.2d at 283. Because the *Bateman* court found the language of the gap insurance clause in the policy at issue to be ambiguous, however, the court construed that language in favor of the insured. *Id.* at 247, 590 A.2d at 284. The *Bateman* court distinguished the facts before it from the facts in *Votedian,* in which the language of the gap insurance clause in the policy at issue was unambiguous, so that it was proper for the *Votedian* court to give effect to that language. *Id.* at 245, 590 A.2d at 283. Appellant, seizing upon this analysis, argues that the gap language in its policy of insurance is very much like the gap language at issue in *Votedian;* therefore, because the supreme

court in *Bateman* found this language to be unambiguous, we are required to follow *Bateman* and give effect to the gap provision at issue instantly. (PDI brief at 20–21.)

We are unpersuaded by this argument, and find support for our position in the following:

> As a general rule, stipulations in a contract of insurance in conflict with, or repugnant to, statutory provisions which are applicable to, and consequently form a part of, the contract, must yield to the statute, and are invalid, since contracts cannot change existing statutory laws.

George J. Couch, Couch on Insurance 2d (Rev. ed) § 13.7 at 827 (1984). While we agree with appellant that "[n]either the courts nor the board of arbitration have a license to rewrite a contract," (Appellant's brief at 3), we also agree with *Couch, supra*, that insurers do not have a license to rewrite statutes.

As the Third Circuit noted in *Tabor, supra, Votedian* involved a contract of insurance that went into effect before the MVFRL was enacted in 1984. *Tabor, supra* at 465. The Legislature prior to 1984 had neither defined underinsurance at the time the parties formed their contract, nor articulated a clear public policy regarding the importance of underinsurance through legislative enactment; the no-fault legislation existing prior to 1984 did not provide for underinsurance at all.

The legislative intent behind the MVFRL was, however, to provide coverage for victims of negligent uninsured *or* underinsured drivers. *See* discussion *supra.* As the *Tabor* court noted:

> Under the MVFRL, insurers *must* offer underinsured motorist coverage, and that coverage *is* controlled by statute *and* by a public policy meant to foster the fullest possible, or 'excess,' coverage. The pre-MVFRL cases, then, are inapposite, and insurers may not by contract convert Pennsylvania's broad statutory scheme for underinsured motorist coverage into a narrow one merely providing 'gap' coverage.

*Id.* at 465–66 (emphasis in original).

Appellant's reliance upon *Bateman, supra*, is likewise misplaced, and for the same reason. In *Bateman*, both the

contract of insurance and the accident giving rise to the claim predated the 1984 enactment of the MVFRL. The *Bateman* court was thus not called upon to discuss the effect of the MVFRL on gap provisions in insurance policies, having before it only the language of the contract itself. We therefore agree with the Third Circuit that these pre-MVFRL cases are inapposite. We turn, then, to appellant's argument that our supreme court's decision in *Windrim, supra,* mandates that we enforce the clear, unambiguous language of its gap provision. (PDI brief at 21.)

In *Windrim,* an uninsured motorist, while operating his uninsured vehicle, was injured in an accident which he alleged was caused by an unidentified hit-and-run driver. Windrim sought to collect uninsured motorist benefits under the terms of his mother's policy with Nationwide, contending that he was insured under his mother's policy because he was a relative residing in his mother's household. The Nationwide policy contained an exclusionary clause which provided in pertinent part:

> This Uninsured/Underinsured Motorists insurance does not apply as follows:
>
> . . . .
>
> 4. It does not apply to bodily injury suffered while occupying or from being hit by a motor vehicle owned by you or a relative living in your household, but not insured for Uninsured or Underinsured Motorists coverage under this policy.

*Windrim, supra* at 130, 641 A.2d at 1155. When Nationwide counterclaimed, seeking declaratory relief on the validity of the policy exclusion, the trial court dismissed the counterclaim, and a panel of this court affirmed. The supreme court reversed, however, holding that the exclusion did not violate the public policy behind the MVFRL. In so holding, that court relied upon a similar Third Circuit case, *Nationwide Mutual Insurance Co. v. Hampton,* 935 F.2d 578 (1991). In *Hampton,* the Third Circuit noted that " '[t]he MVFRL embodies a new policy, expressed in § 1714 [Ineligible claimants], of deterring motorists from failing to insure their vehicles by

barring recovery of private insurance benefits.' " *Windrim, supra* at 132, 641 A.2d at 1156, *quoting Hampton, supra* at 587. Section 1714 specifically precludes recovery of first-party benefits to owners of currently registered motor vehicles who do not have financial responsibility. Thus, the supreme court found in *Windrim* that the clear, unambiguous language of the policy excluding Windrim from coverage was valid and enforceable, because it did not violate any clearly expressed public policy. To the contrary, the exclusion was supported by the clearly expressed policy of not providing insurance benefits to uninsured drivers. *Windrim, supra* at 134–136, 641 A.2d at 1157–58. Furthermore, the *Windrim* court agreed with Judge Popovich, dissenting in *Windrim v. Nationwide Mutual Insurance Co.*, 412 Pa.Super. 155, 160, 602 A.2d 1356, 1359, that a careful review of the MVFRL disclosed that it was silent on the issue of "whether the operator of uninsured vehicle [sic] may recover uninsured motorist benefits under a policy applicable to another vehicle owned by the driver or a relative residing with the driver." *Windrim, supra* at 132, 641 A.2d at 1156.

It is clear from the foregoing that *Windrim* is inapposite. First, the MVFRL was silent on the issue before the court in *Windrim*, whereas in the instant case the MVFRL defines underinsurance in "excess" terms. Second, a clearly expressed public policy supported the exclusion in *Windrim*, whereas in the case instantly, the public policy behind the MVFRL in general, and underinsurance in particular, clearly conflicts with the gap provision. As noted in *Couch, supra*, "contract provisions [that] are not in accord with public policy, and are not advantageous to the insured" are particularly subject to a finding of invalidity. *Couch, supra* at 827–29. Furthermore, while it is true, as appellant argues, that the gap language in its policy was approved by the Insurance Commissioner, we note that "[w]hen there is a question about the effect—if any—such a filing [of an insurance policy form with the Commissioner] has on an adjudication of questions involving the enforceability of coverage terms in an uninsured or underinsured motorist coverage, courts almost invariably con-

clude that the filings do not constitute the type of administrative regulation which justifies judicial deference to the decision of an administrative agency." *Widiss, supra,* § 32.3 at 21. We turn, then, to appellant's argument that its gap provision does not violate the public policy of Pennsylvania.

## PUBLIC POLICY

Appellant argues that "vague notions of public policy" cannot be used to circumvent the clear language of a contract, or, alternatively, that the public policy of Pennsylvania changed when the MVFRL was amended in 1990. We shall address these arguments in sequence.

In support of its first argument, appellant relies upon *Hall v. Amica,* 538 Pa. 337, 648 A.2d 755 (1994). In *Hall,* the insured was injured when his car was forced off the road by a "phantom" driver in Barbados, an independent country; however, his policy limited uninsured motorist coverage to the United States, its territories and possessions, and Puerto Rico and Canada. *Id.* at 339, 648 A.2d at 756. Hall argued that the public policy underlying the MVFRL was to provide a floor of protection for Pennsylvania drivers injured by uninsured motorists. In addition, Hall argued that, because the MVFRL listed only three exceptions to the coverage mandated by the statute, the territorial exception contravened the statute under the principles of statutory construction, particularly *expressio unius est exclusio alterius. Id.* at 344, 648 A.2d at 758–59. The *Hall* court correctly concluded, however, that "public policy is more concrete than a general desideratum which presumably supports the legislation in question and thus forms part of the legislature's intention." *Id.* at 347, 648 A.2d at 760. Since the MVFRL does not address the issue of extra-territorial coverage, therefore, the *Hall* court refused to abrogate a contractual provision of the insurance policy on the basis of what the statute did *not* say.

The instant case is clearly distinguishable and, in fact, is closer to the analogy used by the *Hall* court to describe a

situation in which a contractual provision *would* be void as against public policy. The *Hall* court noted:

> If the statute had explicitly required worldwide uninsured motorist coverage but listed as an exception that an insurer might exclude such coverage in countries subjected to trade sanctions by the U.S. government, then the limitation set forth in the Amica policy at issue would contravene the statute by virtue of 1 Pa.C.S. § 1924 ['Exceptions expressed in a statute shall be construed to exclude all others.'].

*Id.* at 344, 648 A.2d at 759. *See also Jeffrey, supra* at 495, 621 A.2d at 641 ("Neither the UMCA or the MVFRL contains a provision which either directly or by implication precludes an insurer from reducing uninsured motorist benefits by the amounts recovered under the liability portion of the same policy."). In the instant case, however, it is clear statutory language upon which appellee relies to ascertain Pennsylvania's public policy on the issue of "excess" versus "gap" coverage; the statute is *not* silent. The *Hall* court, in making the distinction between valid issues of public policy such as the one before the court in the instant case, and "vague goals," adopted the following analysis of the United States Supreme Court:

> 'Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy.... In the absence of a plain indication of that policy through ... statutory enactments ... the Court should not assume to declare contracts ... contrary to public policy....'

*Hall, supra* at 348, 648 A.2d at 760, *quoting Muschany v. United States,* 324 U.S. 49, 66–67, 65 S.Ct. 442, 451, 89 L.Ed. 744, 756 (1945) (footnotes and citations omitted). It is just such a "plain indication of that policy through [a] statutory enactment[ ]" that confronts us instantly.

In addition to § 1702, which, as we have already indicated, clearly defines underinsurance in Pennsylvania as "excess"

insurance, other sections of the MVFRL place a heavy burden upon the insurer who claims that an insured has waived underinsurance coverage. For example, in order to reject UIM coverage, an insured is required to execute a rejection form reproduced in the statute; if the insurer does not comply with the proper procedure for obtaining the insured's waiver, then the waiver is void. 75 Pa.C.S.A. § 1731 (c.1). The MVFRL also requires that an insurer notify an insured of his right to purchase UIM coverage equal to the limits of his liability coverage under the policy. 75 Pa.C.S.A. § 1791. Where an insured elects lower coverage, the insurer must prove that the election was knowing and intelligent. 75 Pa.C.S.A. §§ 1731, 1734.

Cases interpreting these sections have interpreted them strictly. Insurers who fail to comply with the precise letter of the statute have consistently been required to provide full underinsured motorist coverage. *See, for example, Emig, supra* (neither insured's signature on policy change request form, which indicated an election of lower uninsurance/underinsurance coverages, nor receipt of the statutory "Important Notice" constituted waiver of UM/UIM coverage equal to the policy's bodily liability limits where insured did not request lower limits in writing as required by MVFRL); *Botsko v. Donegal Mutual Insurance Co.*, 423 Pa.Super. 41, 620 A.2d 30 (1993), *allocatur denied,* 536 Pa. 624, 637 A.2d 284 (1993) (failure to obtain a knowing, intelligent, written waiver of the coverage available under the statute requires insurer to provide insured with full coverage mandated by the statute); *Nationwide Insurance Co. v. Resseguie,* 980 F.2d 226 (3d Cir.1992) (written customer service request prepared by secretary of insurance agent, in response to verbal instruction from husband of named insured to lower underinsured coverage limits, did not satisfy requirement of section of MVFRL requiring written request by insured to lower underinsured coverage below policy's liability limits). All of these cases stress the importance of underinsurance in the legislative scheme.

Courts addressing the public policy behind § 1702 have likewise been consistent in finding that allowing an insurance company to "waive" an insured's underinsurance protection by inserting a "gap" provision in a contract subverts the very purpose of the strict waiver provisions of the MVFRL. *See, for example, Fisher, supra* at 1109 (since the proposed settlement was for more than the underinsurance coverage, the insurer's position that the policies provided "gap" coverage was clearly the equivalent of a denial of coverage); *Ober, supra* at 348 ("By means of the set-off provision, [Aetna] is attempting to reduce the plaintiff's underinsured motorist coverage to zero. This would not only violate the express dictates of the MVFRL, but would render plaintiff's uninsured/underinsured coverage illusory."); *Schemberg, supra* at 621–22 (offset provision in automobile policy was invalid as contrary to Pennsylvania public policy where Pennsylvania law required that all liability policies issued in state provide at least $15,000 underinsurance coverage).

The Third Circuit also addressed the policy behind § 1702 in *Tabor, supra.* In *Tabor,* decedent Tabor was killed while riding as a passenger in an automobile. The host's automobile insurance paid Tabor's estate $250,000 in liability damages; however, Tabor's losses and damages were apparently worth a great deal more. As a result, Tabor's father, who was the administrator of Tabor's estate, sought underinsurance in the amount of $300,000 based upon stackable underinsurance benefits of $100,000 available on each of the Tabors' three automobiles. The Tabors' insurer, North River Insurance, attempted to enforce a gap provision in the Tabors' policy similar to the one at issue instantly, thereby offsetting the $300,000 in underinsurance benefits by the $250,000 already paid to Tabor's estate. In refusing to allow such an offset, the Third Circuit opined:

> The facts of this case expose, in the set-off provision, the type of unfairness that has been condemned in anti-stacking provisions. Due to the set-off, the Tabors, while having purchased $300,000 worth of underinsured motorist coverage, are now told that Tabor's estate is entitled to only

$50,000 in coverage. This state of affairs, we believe, would be repugnant to the Legislature of Pennsylvania and to its Supreme Court as well. In sum we believe that the Pennsylvania Supreme Court would not countenance policy provisions that would, in any situation, allow underinsured coverage to be obviated because of a partial recovery received from the negligent underinsured.

*Id.* at 466.[8]

■ In its attempt to refute the holdings of the long line of cases cited *supra*, appellant argues that they are no longer controlling because Pennsylvania's public policy changed in 1990 when the MVFRL was amended. (PDI brief at 26–27.) According to appellant, when the Legislature amended § 1731 of the MVFRL to allow *purchasers of insurance* to opt out of underinsurance coverage, the Legislature also amended the public policy behind the MVFRL. We do not agree.

Section 1731(a) of the MVFRL, prior to 1990, provided:

**General rule.**—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages *are provided therein* or supplemental thereto in amounts equal to the bodily injury liability coverage except as provided in section 1734 (relating to request for lower or higher limits of coverage).

75 Pa.C.S.A. § 1731(a), *repealed* (emphasis added).

The amended § 1731(a) provides:

_____

**8.** While several of the cited federal court cases refer to gap underinsurance provisions in contracts as "illusory," *see Schemberg, supra* at 622, *Ober, supra* at 348, we recognize that some states have opted to allow such provisions based upon a policy of allowing to the injured insured only those benefits he or she has provided for the public. *See* appellant's brief at 30–31; PDI *amicus* brief at 19–20. We need not decide whether, in those instances under gap insurance in which the underinsured insurer pays nothing, such provisions are illusory; instead, we decide only that the Pennsylvania Legislature manifested its intent that insurers provide "excess" insurance by defining underinsurance in "excess" terms. Such a clear manifestation of Pennsylvania public policy ends our analysis.

**Mandatory offering.**—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages *are offered therein* or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage). *Purchase of uninsured motorist and underinsured motorist coverages is optional.*

75 Pa.C.S.A. § 1731(a), Feb. 7, 1990, P.L. 11, No. 6 § 9, effective July 1, 1990 (emphasis added).

The 1990 revisions to the MVFRL thus changed underinsurance coverage in Pennsylvania from a mandatory provision to a mandatory offering. In other words, insurers after 1990 must *offer* underinsurance to their insureds; they do not have to *provide* underinsurance. We nevertheless fail to see how this change in any way affects the obligation of the *insurer.* The option to waive underinsurance coverage rests solely with the *insured,* who may reduce his or her premiums by waiving underinsurance coverage.[9] As already noted, any waiver or reduction in underinsurance benefits must still be knowing and intelligent, with a default to full coverage where the insurer cannot show compliance with the relevant statutory provisions. Furthermore, and most noteworthy, the 1990 amendments did nothing to change the definition of underinsurance under § 1702. It is thus difficult to see how Pennsylvania's public policy has changed with the 1990 amendments to the MVFRL.

Appellant argues that the Third Circuit's holding in *Tabor* is no longer good law because the accident in *Tabor* occurred before the MVFRL was amended in 1990. We note, however, that the *Tabor* court cited the amended § 1731, observing that "every insurance policy issued in Pennsylvania must include 'underinsured motorist coverage' *unless it is rejected by the insured.*" *Tabor, supra* at 464 (emphasis added). The *Tabor*

---

**9.** Even under the MVFRL prior to the 1990 amendments, an insured could opt for lower or higher underinsured limits than those mandated by the Act, thereby affecting the scope of coverage.

court also noted that, "Under the MVFRL, insurers *must offer* underinsured motorist coverage." *Id.* at 465 (emphasis in original and added). It would thus seem that the *Tabor* court's analysis of the public policy behind the MVFRL fully considered the 1990 amendments.

We find further support for our view that the public policy of indemnifying victims of accidents did not change with the 1990 amendments in *Widiss, supra:*

> In every state, there is a general public interest in providing indemnification to individuals who have been injured in motor vehicle accidents. As the Minnesota Supreme Court observed, even though the requirement for underinsured motorist insurance was eliminated [in Minnesota] in 1977, the legislative amendment which clarified the meaning to be accorded to the prior legislative requirement for underinsured motorist coverage continues to manifest the appropriate public interest so that an insurance policy providing this coverage should be interpreted to make the coverage available whenever an insured's damages exceed the amount of an insured driver's liability insurance.

*Widiss, supra,* § 35.4 at 165, *citing Schmidt v. Clothier,* 338 N.W.2d 256 (Minn.S.Ct.1983).[10]

Finally, we address appellant's argument that the alleged public policy change in 1990 favored reduction in costs over full coverage. As already noted, this court has just recently reiterated the legislative intent behind the MVFRL in *Emig, supra.* The *Emig* court found that intent still to be "the greatest possible coverage." *Id.* at 537, 664 A.2d at 566. The 1990 amendments facilitate that goal by allowing those drivers who cannot afford underinsurance or uninsurance to opt out, purchasing liability insurance only. We find nothing in the history of the 1990 amendments, however, that indicates a legislative intent to change the nature of the insurance an insured elects to purchase.

10. *Widiss* notes that even after Minnesota repealed its mandatory *offering* statute, courts continued to interpret underinsurance as "excess" insurance. *See Widiss, supra,* § 35.4 at 165–66 n. 21.

Even if we were to agree with appellant, however, that the main focus of the amended MVFRL is on cost savings, we would still affirm the trial court. Appellant admits that the public policy behind the MVFRL before 1990 precluded "gap" underinsurance coverage in Pennsylvania. (PDI brief at 28 (the 1990 Amendment to § 1731 "clearly shows the legislature's intent to return underinsured motorist coverage back to its pre–1984 days when 'gap' coverage was allowed.").) Despite this admission, however, we find no evidence in appellant's brief or in the record that its insureds realized a cost savings when the 1990 amendments were enacted because appellant was finally able to offer them the allegedly less expensive "gap" underinsurance. Surely, if such evidence existed, appellant would have provided it.

We find further evidence that the Legislature envisioned no such cost reduction in 1990 in the language of the amendments themselves. As part of the 1990 amendments, the Legislature enacted § 1799.7 of the MVFRL. Section 1799.7 required all insurers to make a rate filing by May 1, 1990, that reflected the cost savings generated by the amendments. Included among these cost savings were savings resulting from *rate* reductions to those insureds who elected the limited tort option, and savings resulting from *coverage* reductions for those insureds who elected to reduce or eliminate either first party benefits or *underinsured or uninsured motorist coverage* required prior to the effective date of the 1990 amendments. 75 Pa.C.S.A. § 1799.7(b) and (h). Clearly, if the Legislature had intended a *rate* reduction because underinsurance had become "gap" insurance as a result of the 1990 amendments, it would have included such a rate reduction in § 1799.7(b).

A few observations about the way in which premiums are determined further illustrate the weakness of appellant's cost savings argument. Appellant argues that it is improper for appellee to receive $35,000 of underinsured motorist coverage for $5, while he pays $21 for $35,000 of uninsured motorist coverage and $85 for liability coverage on one car. (Appellant's brief at 26.) Appellant, however, overlooks the fact that underinsurance coverage is always secondary, or excess, cov-

erage by its very nature; the insurer pays nothing unless and until the tortfeasor's coverage is exhausted, and then only if damages exceed the tortfeasor's insurance limits. To put it another way, underinsurance coverage always carries with it a "deductible" of at least the amount of coverage required by a state's financial responsibility law. In Pennsylvania, the MVFRL defines "financial responsibility" as "[t]he ability to respond in damages for liability on account of accidents arising out of the maintenance or use of a motor vehicle in the amount of $15,000 because of injury to one person in any one accident. . . ." 75 Pa.C.S.A. § 1702. As a result, the underinsured insurer pays nothing unless and until the tortfeasor's insurer or the tortfeasor has paid, minimally, $15,000.

In order to determine an appropriate premium for its underinsurance, then, an insurer will submit to the Commissioner of Insurance [11] a rate that reflects both the risk of damages in excess of $15,000, and the percentage of insured drivers who are likely to be "underinsured." [12] As noted in *Couch, supra:*

> The primary requisite essential to a contract of insurance is the assumption of a risk of loss and the undertaking to indemnify the insured against such loss.

> It is characteristic of insurance that a number of risks are accepted, some of which will involve losses, and that such

11. In Pennsylvania, as in many other jurisdictions, the Insurance Commissioner must approve all rate changes. *See* The Casualty and Surety Rate Regulatory Act, 40 P.S. § 1181–1199, 1947, June 11, P.L. 538, repealed insofar as it is inconsistent with 75 Pa.C.S.A. §§ 2001–2009, Section 31 of Act 1990, Feb. 7, P.L. 11, No. 6. Section 1197 provides for judicial review of rates set by the Commissioner only after a hearing before the Commissioner. On review, the court will not substitute its judgment for that of the Commissioner, but will view the evidence in the light most favorable to the party in whose favor the Insurance Commissioner has found, giving to it the benefit of every inference which can be logically and reasonably drawn therefrom. *Insurance Dept. v. Johnson,* 87 Dauph. 31 (1967), *affirmed,* 211 Pa.Super. 138, 238 A.2d 23 (1967), *affirmed,* 432 Pa. 543, 248 A.2d 308 (1968), *cert. denied,* 394 U.S. 1003, 89 S.Ct. 1601, 22 L.Ed.2d 781 (1969).

12. At the time the MVFRL was being debated in the Legislature, for example, a PennDOT report indicated that "[t]he verified *uninsured* rate in Pennsylvania is 4.4 percent on any given date." *See Ronca, supra,* Appendix D:3 at 388.

losses are spread over all the risk so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it.

*Couch, supra,* § 1:3 at 7. Because the record before us is devoid of evidence that a $5 premium is inconsistent with excess underinsurance, and because the 1990 amendments do not support appellant's argument that they were intended to transform excess underinsurance into gap underinsurance, we find no merit to appellant's cost savings argument.

For all of the foregoing reasons, we find that § 1702 clearly expresses the policy of this Commonwealth on the issue of "excess" versus "gap" coverage. Neither the insurer nor this court has the power to render this statutory enactment nugatory.

Accordingly, we affirm the order of the trial court denying appellant's petition to modify or correct the arbitration award. Jurisdiction is relinquished.

POPOVICH, J. files a dissenting opinion joined by CIRILLO, and TAMILIA, JJ.

ROWLEY, President Judge, did not participate in the consideration or decision of this case.

POPOVICH, Judge, dissenting.

I cannot join in the Majority's determination to affirm the trial court's order refusing to modify an arbitration award against Donegal Mutual Insurance Co. in the amount of $15,000.

The facts are not in dispute: Michael Allwein was killed by a vehicle driven by Jeremiah Lauver, who carried $15,000/$30,000 in automobile liability insurance coverage. Also, Michael was insured under his parents' policy with Donegal, which allowed for stacking of underinsured motorist coverage totalling $105,000 on their three vehicles. All parties agreed that the loss experienced by Allwein exceeded the $15,000 liability limits of the party at fault and the $105,000 underinsurance motorist limits of liability of the policy with Donegal.

Donegal's position was that its policy contained an "offset" provision which allowed it to discount the $105,000 by the $15,000 paid by the person legally responsible for the accident. Allwein disputed this contention. Both sides agreed to submit the matter to arbitration, restricting the issue to whether Donegal's "offset" provision violated public policy as embodied in the Motor Vehicle Financial Responsibility Law (MVFRL). 75 Pa.C.S.A. § 1701 *et seq.* The arbitration board ruled in favor of Allwein and ordered Donegal to pay the $15,000 claimed on the offset. When the trial court affirmed the arbitrators' award, an appeal was perfected leading to *en banc* review.

The issue posed for review is rather forthright: Is Donegal's "offset" provision violative of public policy as embodied in the MVFRL? I find it is not, the conclusion premised upon a scrutiny of the statutory provisions regulating the insurance industry (emblematic of Legislative intent as to the scope of coverage) and case law interpreting the insurance field.

. To start with, the predecessor to the present version of Section 1731(a) made it *mandatory* that every policy issued in this Commonwealth must include "underinsured" coverage, unless it was rejected by the insured; to-wit:

(a) General rule. No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverage are *provided* therein or supplemental thereto in amounts equal to the bodily injury liability coverage except as provided in section 1734 (relating to request for lower or higher limits of coverage). [Emphasis added]

Act of Feb. 12, 1984, P.L. 26, No. 11, 3, 75 Pa.C.S.A. 1731(a). This provision was amended in 1990 to allow for the "optional" inclusion of "underinsured" and "uninsured" coverage in a policy issued in this jurisdiction; namely:

(a) Mandatory offering.—No motor vehicle liability insurance policy shall be delivered or issued for delivery in this

Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverage are *offered* therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage). *Purchase of uninsured motorist coverage and underinsured motorist coverage is optional.* [Emphasis added]

Act of Feb. 7, 1990, P.L. 11, No. 6, § 9, 75 Pa.C.S.A. 1731(a).

I find that the statutory change in Section 1731(a) from a *mandatory* to *optional* coverage of uninsured/underinsured is a factor which should not be dismissed as *de minimus* in assessing the public policy strengths of the statute. Rather, it reflects the Legislature's intention to relax its position of inclusion of uninsured/underinsured with limited exception prior to the 1990 amendment to the MVFRL.

Additionally, of interest, is the fact that "offset" provisions in underinsured policies have been upheld as valid. See, e.g., *Kovaleski v. Erie Insurance Group,* 398 Pa.Super. 519, 581 A.2d 585, 591 (1990); *Sparler v. Fireman's Insurance Co. of Newark,* 360 Pa.Super. 597, 521 A.2d 433, 438–39 (1987); *Votedian v. General Accident Fire & Life Assurance Corp.,* 330 Pa.Super. 13, 478 A.2d 1324, 1328 (1984). Further, our Supreme Court in *Hall v. Amica Mutual Insurance Co.,* 538 Pa. 337, 648 A.2d 755 (1994) dealt with the force and effect of a territorial limitation on coverage for an insured injured outside the United States. In doing so, the *Hall* Court remarked that:

Although uninsured motorists coverage serves the purpose of protecting innocent victims from irresponsible uninsured motorists, that purpose does not rise to the level of a public policy overriding every other consideration of statutory construction.

538 Pa. at 347, 648 A.2d at 760–61. Also, in discussing the 1990 amendment to Section 1731(a), the Court wrote:

The fact that a Pennsylvania motorist need not purchase uninsured motorist coverage even within the state of Pennsylvania undermines the argument that public policy in

favor of protection against uninsured motorists has such force, dominance and universality that insurers must offer worldwide uninsured motorist coverage and cannot include any territorial limitations in an uninsured motorist policy. *Id.* at 349, 648 A.2d at 761 n. 2. Likewise, this writer is of the belief that "offset" provisions are not *ipso facto* against public policy, especially given the shift in position by the Legislature and relaxation of the presence of uninsured/underinsured coverage from mandatory to optional in policies sold in this Commonwealth.

The "offset" provision was prominently set forth in Allwein's policy by Donegal. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563, 567 (1983). Thus, Allwein had the "option" to increase his uninsured/underinsured coverage to equal his liability coverage under the policy to accommodate an unforeseen injury. Yet, it would appear that in 'one's haste to minimize premiums, coverage is sacrificed for cost reduction. We should not reward an insured who chose to "cap" underinsured coverage at $35,000 (with a $5 premium payment) by awarding him "excess" insurance coverage which he could have secured instead of the "offset" version of indemnification.

This Court should not do what the Legislature has indicated otherwise. At bar, my reading of the legislative history of the MVFRL and case law interpreting it, the Majority has deviated from the clear intent of the law to allow for "offset" insurance provisions. The use of "public policy" as a talismanic "catch all" phrase to tarnish the validity of Donegal's "offset" provision misses the mark since the express contractual policy terms are not, in the clearest fashion, contrary to *de facto* or *de jure* public policy. See *Hall,* supra. Accordingly, I cannot join in the Majority's decision to assail Donegal's policy limiting coverage by contractual agreement between the parties. *Sparler,* supra.

I respectfully dissent.

CIRILLO and TAMILIA, JJ., have joined in this dissenting opinion.