**Frank WENKOSKY, Plaintiff,**

v.

**PROTECTIVE INSURANCE COMPANY, Defendant.**

**Civ. No. 87–1168.**

United States District Court,
M.D. Pennsylvania.

Sept. 13, 1988.

Michael E. Weinstein, Weinstein & Schneider, Port Jervis, N.Y., Ronald M. Bugaj, Bugaj & Henry, Honesdale, Pa., for plaintiff.

Richard J. Mills, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for defendant.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Currently before the court is a diversity action in which plaintiff Frank Wenkosky seeks a declaratory judgment on the issue of defendant Protective Insurance Company's (Protective) obligation to defend and indemnify plaintiff pursuant to an automobile insurance policy. For the reasons that follow, the court will declare that the insurance policy does not afford coverage to plaintiff for any claims arising out of the accident on August 23, 1983.

## BACKGROUND

Plaintiff is an adult individual residing at Lake Ariel, Pennsylvania. At all times relevant to this action, he used the trade name S & W Contractors. Plaintiff was the lessor of a truck tractor semi-trailer combination rig under a lease with Daily Express, Inc., a certificated motor carrier authorized by the Interstate Commerce Commission (ICC) to transport goods in interstate commerce. *See* document 21 of record (Stipulation of Facts), at ¶¶ 1, 3, and 4 and Exhibit A (lease agreement). Pursuant to the lease agreement, plaintiff used his rig for the transportation of goods in interstate commerce under the authority granted to Daily Express by the ICC.

Defendant Protective is a corporation engaged in the business of automobile liability insurance maintaining its principal place of business in Indianapolis, Indiana. Under the terms of the lease agreement between plaintiff and Daily Express, Daily agreed to maintain insurance coverage while the equipment was being operated in accordance with the terms of the agreement, but plaintiff was required to provide "bobtail/deadhead" insurance coverage for his rig. *See id.,* Exhibit A, at ¶ 13. The parties agree that "bobtail/deadhead" insurance is the term generally used in the trucking industry to describe what the insurance industry calls "non-trucking use" coverage. Daily Express as a service to its lessors made such coverage available to its leased operators under a group insurance policy written by defendant. *See id.* at ¶¶ 2, 6–8 and Exhibit B. The policy was in

full force and effect at all times material to this action, and plaintiff was insured under that policy. The instant action centers around the following exclusionary language contained in the insurance policy:

It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability and Property Damage Liability does not apply;

(a) To any person or organization, or any agent or employer thereof other than the insured owner-operator, engaged in the business of transporting property by automobile for others;

(b) While the automobile or any trailer attached thereto is used to carry property in any business;

(c) While the automobile is being used in any business of Daily Express, Inc., or of any person or organization engaged in the business of transporting property by automobile for others.

*See* document 21 of record, Exhibit B, Endorsement No. 1.

Prior to August 23, 1983, plaintiff was dispatched and did carry a load of goods on his rig to Enfield, Connecticut at the direction of Daily Express. After delivering the goods, plaintiff did not return to the place of business of Daily Express, to the point of origin of the trip, or to his place of residence. Instead, he drove his rig to Ashley Falls, Massachusetts where his equipment was loaded with logs to be delivered to or on behalf of Richard Myers in Moscow, Pennsylvania. *See* document 21 of record, at ¶¶ 11–12.

Delivery of the logs was to be made either on behalf of Country Log Homes, Ashley Falls, Massachusetts or Richard Myers, who was doing business as Country Village Log Homes. Country Log Homes is in the business of designing, manufacturing, selling, and distributing logs with designs for the construction of log homes, and Country Village Log Homes is in the business of selling, distributing, and constructing log homes with the use of logs and designs supplied by Country Log Homes. Hauling these logs was a departure from the business of Daily Express and was outside the scope of plaintiff's contractual relationship as plaintiff was not hauling any items for Daily Express at the time. In exchange for hauling the logs to Lake Ariel, Pennsylvania, plaintiff was to be paid approximately $200 by Richard Myers. *Id.* at ¶¶ 13–17.

During the course of the trip from Ashley Falls, Massachusetts to Lake Ariel, the accident giving rise to the instant dispute occurred. According to the civil complaint filed in the Supreme Court of New York, one or more of the manufactured logs being hauled on plaintiff's rig fell onto the highway. It is further alleged that one of the plaintiffs in the underlying accident, Julius E. Swarts, attempted to remove the log from the highway and sustained injury when he was struck by an automobile being operated by Mamie H. Seruby, a named defendant. Plaintiffs in the underlying action contend that Wenkosky was negligent in allowing the logs to fall from his rig.[1]

Plaintiff Wenkosky filed the instant action on July 27, 1987 in the Wayne County Court of Common Pleas after defendant issued a disclaimer based on the exclusionary language quoted above. Plaintiff seeks a declaration that the policy affords coverage for the underlying accident, that the disclaimer is void, and that defendant is obligated to defend and indemnify him against any claims arising from the August 23 accident. Defendant removed the action to this court on August 19, 1987, claiming the existence of diversity jurisdiction. The case was placed on this court's May 31, 1988 trial list. *See* document 9 of record. At the pretrial conference, the jury trial was canceled after the parties agreed to submit a stipulation of facts. *See* document 15 of record. That stipulation was filed on August 1, 1988. *See* document 21 of record. The parties also submitted testi-

---

1. Daily Express was dismissed from the underlying action on a summary judgment motion after the court concluded that plaintiff was an independent contractor at the time of the accident and that, even if he were an employee, the private haul for Myers was without authorization from or knowledge of Daily Express and thus outside plaintiff's scope of employment. *See* document 22 of record, Attachment (copy of opinion).

monial affidavits and briefs, the last of which was received on August 10, 1988. *See* document 24 of record. This matter is now ripe for disposition.

### DISCUSSION

■ Plaintiff Wenkosky was at all times relevant to this litigation a resident of Pennsylvania. Daily Express, which made the coverage here at issue available to certain of its leased operators, including plaintiff, is located in Carlisle, Pennsylvania, where the policy was delivered. The court will therefore look to the law of Pennsylvania in determining the effect to be given to the language in the instant policy. *See Aetna Casualty & Surety Co. v. Farrell,* 855 F.2d 146, 148 (3d Cir.1988).[2]

■ The task of interpreting a contract is generally performed by a court rather than a jury. *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 304, 469 A.2d 563, 566 (1983). The goal in interpreting an insurance contract, like any other contract, is to ascertain the intent of the parties as manifested by the language of the written instrument. *Hess v. Allstate Insurance Co.,* 614 F.Supp. 481, 485 (W.D.Pa.1985), *aff'd,* 804 F.2d 1248 (3d Cir.1986). If the words of the policy are clear and unambiguous, the court must give the words their plain and ordinary meaning. *Id.; see also Pacific Indemnity Co. v. Linn,* 766 F.2d 754, 760–761 (3d Cir.1985); *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. at 305, 469 A.2d at 566. When a term in the policy is ambiguous, however, and the intention of the parties cannot be discerned from the face of the policy, the court, in its attempts to arrive at a reasonable construction of the policy that is in accord with the parties' apparent intention, may look to extrinsic evidence of the purpose of the insurance, its subject matter,

the situation of the parties, and the circumstances surrounding the making of the contract. *Northbrook Insurance Co. v. Kuljian Corp.,* 690 F.2d 368, 372 (3d Cir.1982) (citing *Celley v. Mutual Benefit Health & Accident Assoc.,* 229 Pa.Super. 475, 482–483, 324 A.2d 430, 434 (1974)). Where ambiguous, insurance contracts are to be construed strictly against the insurer, *Mohn v. American Casualty Co.,* 458 Pa. 576, 586, 326 A.2d 346, 351 (1974), and any ambiguities are to be resolved in favor of the insured. *Pacific Indemnity Co. v. Linn,* 766 F.2d at 761. The language of a policy may not be tortured, however, to create ambiguities when none exist. *Id.* Finally, exclusions from coverage will be effective against an insured if they are clearly worded and conspicuously displayed, irrespective of whether the insured read the limitations or understood their impact. *Id.* (citing *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. at 307, 469 A.2d at 567).

■ The court finds nothing ambiguous about the exclusionary language contained in defendant's policy. To the contrary, the court finds the exclusions to be clearly worded and unambiguous. *See Ayres v. Kidney,* 333 F.2d 812, 813 (6th Cir.1964) (exclusion "while the automobile or any trailer attached thereto is used to carry property in any business" is clear and unambiguous); *Central National Insurance Company of Omaha v. Liberty Mutual Insurance Co.,* 685 F.Supp. 123, 125–126 (D.S.C.1988) (exclusions for "covered auto while used in the business of anyone to whom the auto is rented" must be given its plain, ordinary, and popular meaning); *St. Paul Fire & Marine Insurance Co. v. Frankart,* 69 Ill.2d 209, 13 Ill.Dec. 31, 370 N.E.2d 1058 (1977) (exclusion "while the automobile or any trailer attached thereto is used to carry property in any business" must be construed according to its recog-

---

**2.** In employing Pennsylvania's "flexible choice-of-law rule," *see American Contract Bridge League v. Nationwide Mutual Fire Insurance Co.,* 752 F.2d 71, 74 (3d Cir.1985), one factor the court should look at is where the harm occurred. Here, the underlying accident occurred in New York. Nevertheless, under Pennsylvania's "policy, interests and contacts test," *id.* at

75, the court believes Pennsylvania law should apply. Moreover, the court finds New York law regarding the interpretation of insurance policies to be the same as Pennsylvania law on this point. *See, e.g., American Home Products Corp. v. Liberty Mutual Insurance Co.,* 565 F.Supp. 1485, 1492–1493 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984).

nized common usage in conjunction with the rest of the policy); *Brun v. George W. Brown, Inc.,* 56 Misc.2d 577, 289 N.Y.S.2d 722 (1968) (no ambiguity in Truckmen's endorsement virtually identical to the exclusionary language here at issue). The court must therefore give the words their plain and ordinary meaning. *Hess v. Allstate Insurance Co., supra; Pacific Indemnity Co. v. Linn, supra.*

■ The exclusion contained in defendant's policy states that the policy is not applicable "[w]hile the automobile or any trailer attached thereto is used to carry property in any business" or "[w]hile the automobile is being used in any business of Daily Express, Inc. or of any person or organization engaged in the business of transporting property by automobile for others." The court finds both exclusions to be here applicable.

The court concludes that plaintiff, while hauling the logs for Richard Myers and County Village Log Homes, was "engaged in the business of transporting property by automobile for others." Both parties concede that, in exchange for hauling the logs for Myers and Country Village Log Homes, plaintiff was to receive approximately $200. *See* document 21 of record, at ¶ 16. In his deposition, plaintiff testified as follows:

A The price of what I got paid for the load covered going up. If I was lucky to get a load back I would get paid again. If I had to come home empty, in other words, they didn't pay empty miles.

Q And if you got a load in Massachusetts who would pay you for bringing that back?

A Whoever I got it from. If it was Daily, Daily would pay me. If I could find a load from another company, they would pay me. We could trip lease when we did work for Daily.

Q The other company paid you if you brought a load back from Massachusetts?

A If I trip leased, yes.

Q Did you trip lease for Mr. Myers in the spring of 1983 when you brought a load of logs back?

A Well, you could call it that, but there's no paperwork involved.

Q Did you have an understanding with him to the effect that you would be paid—

A Yes.

Q —for bringing those logs back in the spring of 1983?

*   *   *   *   *   *   *

Q Did you have an oral agreement with him insofar as bringing logs back?

A Yes.

Q And what was the substance of the oral agreement?

A If I was up there could I bring them back, and I said, well, yes. I knew when I was gonna go up and I didn't get nothing up there, so I brought them back.

Q And did Mr. Myers pay you for bringing back the logs in the spring of 1983?

A Yes.

Q When you got the payment from Mr. Myers for bringing back the logs in the spring of 1983 did you keep that money or did that money have to go to Daily Express?

A No. That was my—

Q Did you share in any way with Daily Express—

A No.

Q —the payment Mr. Myers paid you for hauling the logs in the spring of 1983?

A No.

Q Now when you operated your tractor-trailer for the hauling of goods for Daily Express, Inc., who paid for the expenses for gas and oil and so forth for the trip?

A I did.

Q Did you receive any compensation from Daily Express, Inc. for the gas and oil expense?

A No.

*See* document 24 of record, Wenkosky Deposition, at pp. 58–60; *see also id.,* Cummings Deposition, at p. 107 (plaintiff was paid a percentage of Daily Express's tariff rate to the shipper); document 21 of

record, Exhibit A, at p. 1 (lease agreement provision regarding payment to plaintiff). Plaintiff's characterization of the trip as a favor for Myers and the payment as reimbursement for expenses is not controlling. In fact, plaintiff testified that he hauled the logs for Myers only after he called the Daily Express terminal in Carlisle, Pennsylvania and discovered that no suitable load was then available for him. *See* document 24 of record, Wenkosky Deposition, at p. 94. Thus, rather than "come home empty" for no pay, *see id.* at p. 58, plaintiff elected to haul the logs for Myers and Country Village Log Homes for $200. The court thus concludes that, when plaintiff was hauling the logs for Myers and Country Village, he was "engaged in the business of transporting property by automobile for others," and, therefore, defendant's policy does not afford coverage to plaintiff.

■ The court also concludes that, while hauling the logs for Myers and Country Village Log Homes, plaintiff's rig was being used "to carry property in any business," namely, the business of Richard Myers and Country Village Log Homes. As stipulated by the parties, Country Village Log Homes is in the business of selling, distributing, and constructing log homes with the use of logs designed by Country Log Homes of Ashley Falls, Massachusetts using structural designs supplied by Country Log Homes. *See* document 21 of record, at ¶ 15. Richard Myers, who operates Country Village Log Homes, acts as a sales representative for Country Log Homes, sells the home, writes the contract for the customer, and then receives a commission from the sale. *See* document 23 of record, Myers Deposition, at pp. 4–5, 23 [*hereinafter* July 24 Myers Deposition]; document 24 of record, Myers Deposition, at pp. 4, 7 [*hereinafter* May 23 Myers Deposition]. Myers made an agreement with the president of Country Log Homes, Bob Bene, whereby Myers would take a precut home from Country Log Homes that had originally been manufactured for a customer and either sell the logs as a kit or spec-build the home for possible sale, with payment going to Country Log Homes after either transaction was completed. *See* July 24 Myers Deposition, at pp. 9–11, 36–38; May 23 Myers Deposition, at pp. 16–21. Myers then asked plaintiff, and plaintiff agreed, to haul the logs to Pennsylvania and store them on his property until Myers took the home or built and sold it. *See* July 24 Myers Deposition, at pp. 8–9, 14. Plaintiff was to receive approximately $200–$300 for his efforts from the proceeds of the sale. *See id.* at p. 14; *see also* document 24 of record, Wenkosky Deposition, at pp. 83, 89–90. Plaintiff picked up the logs at the premises of Country Log Homes, and his truck was loaded by employees of Country Log Homes. *See* document 24 of record, Wenkosky Deposition, at pp. 61–64. While returning to Pennsylvania with the shipment, one of the logs allegedly fell off the rig and caused the underlying accident. Thus, the court concludes that plaintiff's rig was being used "to carry property in any business" at that critical time, and that defendant's policy does not afford coverage to plaintiff.

In his affidavit in lieu of testimony, plaintiff stated as follows:

14. I understand that I had insurance coverage on my truck and trailer through Daily Express when I was hauling directly for them, and I believed that at other times when not hauling for Daily Express I had coverage under the policy provided through Daily Express by Protective Insurance Company, the Defendant.

15. I would not have operated my truck and trailer on any occasion unless I thought I had proper and adequate insurance coverage.

*See* document 20 of record, at ¶¶ 14–15. These contentions are of no moment. The court has already concluded that the exclusionary language in defendant's policy is clear and unambiguous. Such being the case, the exclusions are effective against plaintiff regardless of his understanding of their impact. *Pacific Indemnity Co. v. Linn,* 766 F.2d at 761; *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. at 307, 469 A.2d at 567.

The court realizes that several courts have construed exclusionary language sim-

ilar to that here at issue as ambiguous. *See, e.g., Zurich Insurance Co. v. Rombough,* 384 Mich. 228, 180 N.W.2d 775 (1970); *McLean Trucking Co. v. Occidental Fire & Casualty Company of North Carolina,* 72 N.C.App. 285, 324 S.E.2d 633 (1985), *review denied,* 313 N.C. 603, 330 S.E.2d 611 (1985). While this court has already concluded that the policy here at issue is unambiguous, plaintiff would· not be helped were the court to conclude otherwise. As stated previously, in attempting to arrive at a reasonable construction of the policy that is in accord with the parties' apparent intention, the court may look at extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract. *Northbrook Insurance Co. v. Kuljian Corp.,* 690 F.2d at 372. According to Roger Cottrell, Assistant Vice President for defendant Protective Insurance, the policy in question was intended to provide limited coverage to plaintiff. While plaintiff was operating his rig at the direction of Daily Express, then Daily would be responsible for the movement of that rig and would be obligated to respond to damages caused by the rig while operating under its direction. *See* document 19 of record. It would follow that, if plaintiff executed a trip lease with another carrier, the latter would be responsible for damages caused by plaintiff while he was operating under the direction of the trip lease carrier. Thus, plaintiff would need additional insurance protection only when he was operating his rig under the direction of no carrier or shipper. *See, e.g., Neal v. St. Paul Fire & Marine Insurance Co.,* 197 Neb. 718, 250 N.W.2d 648 (1977) ("Insurance, known as 'bobtail and deadhead insurance' was purchased by the carrier to cover the equipment when it was not under load, was being serviced, or was being used for some other nonrevenue purpose"). This is consistent with Cottrell's affidavit, which reads as follows:

8. It was intended by Protective Insurance Company that this coverage applied when the truck equipment was used by the insured casually or for personal business and not when the equipment is being used for hire or in the business of hauling goods or carrying property for others in addition to Daily Express, Inc.

9. The policy in question, with the exclusionary language set forth above, was designed specifically and was premium-rated by Protective Insurance Company to afford protection to the owner or operator when the vehicle was in a nontrucking situation. The policy was written in anticipation that the owners or operators involved in the use of the equipment would purchase the primary insurance they needed if they intended to engage in trucking operations in addition to their permanent lease obligation with Daily Express.

*See* document 19 of record, at ¶¶ 8–9.

The exclusionary language in defendant's policy clearly implements this intent. Under exclusion (a), no coverage is available to any person *other than the insured owner-operator* (*i.e.,* plaintiff) engaged in the business of transporting property by automobile. Under exclusion (b), no coverage is provided whenever the equipment is being used to carry property in any business, regardless of who is operating the equipment or under whose direction the property is being carried. Under exclusion (c), no coverage is available whenever the automobile is being used in the business of transporting property, regardless of whether it is in fact carrying property at any one moment. Thus, giving meaning to each exclusion, coverage would be provided only when plaintiff was himself operating the rig for some purpose other than carrying property in a business or in some nonrevenue producing activity. Here, plaintiff was operating his rig in a revenue producing activity and was carrying property to be used in the business of Richard Myers and Country Village Log Homes. Thus, no coverage is available under defendant's policy.[3]

An appropriate Order will enter.

---

**3.** The court must emphasize that the discussion regarding purpose and intent is largely academic as it has concluded that defendant's policy is clear and unambiguous.

## ORDER

Now, this 13th day of September, 1988, in accordance with the accompanying Memorandum, THE COURT DECLARES ITS JUDGMENT AS FOLLOWS:

(1) Defendant's policy for nontrucking use does not afford coverage to plaintiff for any claims arising out of the accident on August 23, 1983.

(2) Defendant is not obligated to defend plaintiff in the underlying tort action now pending or in any other actions that may be brought against him as a result of the accident.

(3) The Clerk of Court is directed to close this case.