

Villanova University School of Law

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-27-2006

# Canal Ins Co v. Underwriters Lloyds

Precedential or Non-Precedential: Precedential

Docket No. 04-3714

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Canal Ins Co v. Underwriters Lloyds" (2006). *2006 Decisions.* Paper 1660.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1660

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-3714

CANAL INSURANCE COMPANY,

Appellant

v.

UNDERWRITERS AT LLOYD'S LONDON

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 03-cv-02333)
District Judge: Honorable Eduardo C. Robreno

Argued September 27, 2005

Before: ALITO, AMBRO and LOURIE,* <u>Circuit Judges</u>

* Honorable Alan D. Lourie, Circuit Judge for the
United States Court of Appeals for the Federal Circuit, sitting
by designation.
(Filed: January 27, 2006)

Walter H. Swayze, III, Esquire (Argued)
Michael J. Farrell, Esquire
Segal, McCambridge, Singer & Mahoney
30 South 17th Street
United Plaza, Suite 1700
Philadelphia, PA 19103

Counsel for Appellant

Timothy A. Kulp, Esquire (Argued)
Margolis Edelstein, Esquire
6th & Walnut Streets
The Curtis Center, 4th Floor
Philadelphia, PA   19106

Lawrence D. Wright, Esquire
Ronald S. Collins, Jr., Esquire
Wright & O'Donnell
15 East Ridge Pike, Suite 570
Conshohocken, PA   19428

Counsel for Appellee

Brian J. Hunt, Esquire
Anndra L. Masters, Esquire
Williams, Montgomery & John
20 North Wacker Drive
2100 Opera Building
Chicago, IL   60606

Counsel for Amicus-Appellant

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

This is an insurance coverage dispute arising out of a motor vehicle accident involving a truck owned by Sukhjit Singh and a passenger vehicle driven by Suzanne Espenshade. At the time of the accident, the truck, used for hauling freight, was on the road principally for Singh to seek its sale or trade-in. Among the issues before us is whether a policy issued by Underwriters at Lloyd's London (Underwriters) covering Singh's truck, but excluding "business uses," nonetheless insures this accident. We believe the answer is no, and therefore affirm the District Court's decision. We affirm as well the Court's determinations that Singh's expectation of business coverage cannot unloose the policy's unambiguous language to the contrary, and that Pennsylvania public policy does not undermine non-coverage in this case.

## I. Facts and Procedural History

The material facts are undisputed. At all times relevant to this litigation, Singh was an independent trucker, or "owner operator," who leased his tractor trailers to interstate motor

carriers for the purpose of hauling freight. Singh enjoyed a business relationship with BIR Transport Company (BIR), an interstate trucking outfit and Department of Transportation authorized motor carrier, based upon a long-term lease agreement. According to the agreement, Singh leased a Kenworth Tractor to BIR when BIR required a tractor truck to haul freight.

As of the date of the accident, two relevant insurance policies were in effect. Canal Insurance Company (Canal) insured BIR through a "Commercial Trucking Liability" policy, providing indemnity and defense to BIR for liabilities arising from the operation of vehicles specifically noted in the Canal policy and used for BIR business purposes. BIR identified the Tractor as an insured vehicle subject to the terms of the Canal commercial trucking liability policy. In addition, Singh was covered by a "Non-Trucking Liability" policy with Underwriters that also identified the Tractor as an insured vehicle. Under the terms of that policy, certain uses of the Tractor, including "business uses," were excluded from coverage.

On April 20, 2000, Singh completed an interstate hauling operation for BIR with his Tractor. Four days later, on April 24, 2000, he hired a third party to drive the Tractor and its empty trailer from Harrisburg, Pennsylvania, to a Kenworth truck dealership in Chester, Pennsylvania, in order to attempt a sale or trade-in for a new tractor. Although BIR was made aware of

4

the plan to go to the dealership, it is undisputed BIR did not dispatch the Tractor. In the event a hauling load from BIR became available in the Chester area, however, Singh directed his driver to make the trip with an empty trailer attached.

En route to the dealership, Singh's truck collided with a vehicle owned and driven by Espenshade. As a result of the accident, Espenshade filed a lawsuit in Philadelphia, Pennsylvania, against all potential tortfeasors. Underwriters expressly refused either to defend the defendants or to indemnify Canal in the state action on the ground that the use of the Tractor on the day of the accident did not fall under the provisions of its non-trucking liability policy. Canal, on the other hand, defended and indemnified Singh, his driver, and BIR in the lawsuit. Ultimately, Canal settled the Espenshade suit, agreeing to pay $58,500 compensation in exchange for full liability releases for all three defendants. It is undisputed that Canal incurred an additional $27,459 in litigation expenses to resolve the matter, resulting in a total indemnification and defense cost of $85,959.

Canal filed a declaratory action pursuant to 28 U.S.C. § 2201 in the Eastern District of Pennsylvania seeking indemnification from Underwriters for the monies Canal spent defending and insuring the defendants in the Espenshade lawsuit. *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352 (E.D. Pa. 2004). Subsequent to discovery, the parties filed cross-motions for summary judgment. *Id*. at 352.

5

The District Court determined that Singh's act of hiring an employee to drive his Tractor to a dealership in order to trade the vehicle or otherwise attempt a sale was an activity promoting the "business purposes of the [i]nsured" under the terms of Underwriters' business use exclusion. *Id*. at 355-56. As a result, the Court concluded that coverage was properly denied by Underwriters. *Id*. at 357. Judgment was entered granting Underwriters' motion for summary judgment and denying Canal's cross-motion for summary judgment. This appeal followed.[1]

## II. **Preliminary Matters**

Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of fact exists, we resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). "The interpretation of the scope of coverage of an insurance contract is a question of law

---

[1]The parties are diverse and the amount in controversy exceeds the jurisdictional requirement. Thus, the District Court properly asserted subject matter jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291.

properly decided by the court, a question over which [this court] exercise[s] plenary review." *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999); *McMillan v. State Mut. Life Assurance Co. of Am.*, 922 F.2d 1073, 1074 (3d Cir. 1990).

Where federal jurisdiction is based on diversity of citizenship, as it is here, we apply the choice-of-law rules of the state in which the district court sat. *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 n.3 (3d Cir. 1991) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). As previously noted, this action was filed in the Eastern District of Pennsylvania. Under Pennsylvania choice-of-law rules, an insurance contract is governed by the law of the state in which the contract was made. *Crawford v. Manhattan Life Ins. Co.*, 221 A.2d 877, 880 (Pa. Super. Ct. 1966); *see also McMillan*, 922 F.2d at 1074. "An insurance contract is 'made' in the state in which the last act legally necessary to bring the contract into force takes place." *Crawford*, 221 A.2d at 880. Here, the parties agree that the insurance contract was 'made' in Pennsylvania and, consequently, Pennsylvania substantive law applies.

## III.  Merits

### A.  Ambiguity of Underwriters' Business Use Exclusionary Language

Canal contends Underwriters' business use exclusionary

7

language, which prohibits any use of the covered vehicle that promotes the "business purposes" of the insured, is sufficiently ambiguous to merit an interpretation in favor of coverage. Underwriters, on the other hand, maintains that its business use exception is unambiguous and coverage was properly denied.

It is uncontested Underwriters' policy names Singh as the insured and lists the Tractor as a covered vehicle. The policy, however, excludes from coverage certain "business uses." Exclusion 8 specifically provides that the policy does not insure

> [a] covered automobile while it is engaged in Business Use, such as proceeding to a new location, pursuant to the request, direction, control and/or dispatch of any person or entity other than the insured, or complying with any term of a presently effective, written lease with a motor carrier.

The policy also excludes insurance for "a covered automobile while used in the course and scope of the commercial business of the insured, *i.e.* Business Use." Under the policy, that

> includes, but is not limited to[,] ***any use of the covered auto that promotes the business purposes of the Insured*** or the purposes of a written, permanent lease that the Insured has signed with a motor carrier such as hauling a load

8

for the motor carrier, being under the request, direction, control and/or dispatch to haul a load for the motor carrier with a pick up of a load, laying over on the road on the way to pick up a load or traveling for the purposes of repairing or maintaining the covered auto. The foregoing examples of "Business Use" are illustrative and non-exhaustive.

(Emphasis added.) Thus, if at the time of the accident, Singh's Tractor was engaged in an activity "promot[ing] [Singh's] business purposes," Underwriters' business uses exclusion applies and coverage could be denied.

The legal axioms governing insurance policy interpretation are well settled in Pennsylvania. "Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). The goal of interpreting an insurance policy, like the goal of interpreting any other contract, is to determine the intent of the parties as manifested by the language of the policy.

The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to

9

ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n*, 517 A.2d 910, 913 (Pa. 1986) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)) (additional citations omitted). This rule of strict construction against the insurer is especially true should the ambiguity exist as an exception to general liability. *Celley v. Mut. Benefit & Health Ass'n*, 324 A.2d 430, 435 (Pa. Super. Ct. 1974).

Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (Pa. Super. Ct. 1986). "This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Constr. Co.*, 735 A.2d at 106. Courts should not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. Super. Ct. 1982). In any

10

event, "[t]he polestar of our inquiry . . . is the language of the insurance policy." *Madison Constr. Co.*, 735 A.2d at 106.

As stated above, this controversy turns on whether the phrase "any use of the covered auto that promotes the business purposes of the [i]nsured" applies unambiguously to Singh's use of the Tractor at the time of the accident. Underwriters' policy does not provide specific examples of activities that would promote Singh's business purposes. Where critical terms are left undefined in a policy, Pennsylvania case law instructs that

> [w]ords of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, *Easton v. Washington County Ins. Co.*, 137 A.2d 332, 335 (1957); *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 123 A.2d 413, 415 (1956), and we may inform our understanding of these terms by considering their dictionary definitions.

*Madison Constr. Co.*, 735 A.2d at 108. The District Court heeded this guidance, reasoning that

> [t]he term "promotes" is defined in Webster's Ninth Collegiate Dictionary (1990) as "to contribute to the growth or prosperity of" or "furthers." It is beyond argument that trading up one tractor for another (or attempting to do so)

11

"further[ed]" or "contribute[d] to the growth or prosperity of" Mr. Singh's truck leasing business.

Since Mr. Singh is the insured, engaged in the business of leasing tractors, and further since the act of traveling from Harrisburg to Chester "contribute[d] to the growth or prosperity of" or "futher[ed][,]" i.e., "promote[d][,]" the business purposes of Mr. Singh's leasing business, the losses resulting from the accident fall within the exclusion of the Underwriters policy.

*Canal Ins. Co.*, 333 F. Supp. 2d at 355. We agree. *See Standard Venetian Blind Co.*, 469 A.2d at 567 (stating exclusions from coverage effective against insured if clearly worded and conspicuously displayed, irrespective of whether the insured read limitations or understood their effect); *cf. Ayres v. Kidney*, 333 F.2d 812, 813 (6th Cir. 1964) (ruling exclusion "while the automobile or any trailer attached thereto is used to carry property in any business" clear and unambiguous); *Wenkosky v. Protective Ins. Co.*, 698 F. Supp. 1227, 1230-31 (M.D. Pa. 1988) (holding exclusion "[w]hile the automobile or any trailer attached thereto is used to carry property *in any business*" is unambiguous) (emphasis in text).

Canal, however, does not contend it was unreasonable for the District Court to interpret the plain meaning of "business purposes" to include Singh's desire to trade or sell the Tractor.

12

*See* Aplt. Br. at 19. Rather, it maintains that Underwriters' business use exception relating to acts promoting the business purposes of the insured is overly broad and ambiguous. This is because the exception can be reasonably construed to mean that only acts related to or furthering the business of a commercial carrier (such as BIR) are subject to exclusion; not acts merely related to selling or trading the Tractor. *Id*. In other words, "traveling to negotiate a possible sale or trade of a vehicle is not 'business use' since it does not relate to a carrier-directed activity and is not maintenance or repair of the vehicle." Aplt. Rep. Br. at 4. Thus, the question we must resolve is whether Canal's alternative interpretation of Underwriters' business use exclusion renders the exception ambiguous with regard to the facts of this case. Complicating this determination is the absence of controlling state precedent.

When there is no Pennsylvania Supreme Court decision directly on point, we are charged with predicting how it would resolve the question at issue. *Travelers Indem. Co. of Illinois v. DiBartolo*, 131 F.3d 343, 348 (3d Cir. 1997). In order to do so, we must take into consideration (1) what the Pennsylvania Supreme Court has said in related areas, (2) the decisional law of the Pennsylvania intermediate courts, (3) federal cases interpreting state law, and (4) decisions from other jurisdictions that have discussed the issue. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 675 (3d Cir. 2002).

Canal contends that

13

> Mr. Singh is an independent interstate truck driver; his business is driving a commercial tractor-trailer to transport the goods of third-parties on behalf of a commercial carrier. Mr. Singh does not make his living leasing vehicles as a dealership or rental agency might. Also, rather than functioning as a salaried employee of BIR and using a BIR-owned tractor, Mr. Singh chose to purchase his own tractor and enter into a leasing arrangement with BIR whereby Mr. Singh would be responsible for his own vehicle presumably in return for a greater share of the profit.

Aplt. Br. at 20. "Accordingly, an understanding of Mr. Singh's business reveals it is not so clear that the act of driving the Tractor to a dealership in order to trade or otherwise negotiate a sale unambiguously 'promotes the business purposes' of Mr. Singh." *Id.*

The weight of relevant authority does not support Canal's reasoning. "Business use" and "business pursuits" exclusions are standard clauses in many insurance policies, including homeowners', personal umbrella, and other general liability policies. *See generally Construction and Application of "Business Pursuits" Exclusion Provision in General Liability Policy*, 48 A.L.R. 3d 1096 § 2 (West 2005). In a typical policy, the insurer states that personal liability coverage shall not apply

14

"to bodily injury or property damage arising out of business pursuits of any insured except activities therein which are ordinarily incident to nonbusiness pursuits." *See, e.g.*, *Bullock v. Pariser*, 457 A.2d 1287, 1288 (Pa. Super. Ct. 1983). "The purpose of a 'business pursuits' exclusion is to help the insurer keep premiums at a reasonable level by eliminating a type of coverage that (1) normally requires specialized underwriting and rating, (2) is not essential to most purchasers of the policy, and (3) is provided by other insurance contracts a business owner is likely to have." *Avoiding the "Business Pursuits" Exclusion – Insured's Activity as Not Business Pursuit*, 15 Am. Jur. Proof of Facts 3d 515 §1 (West 2005); *see also Rykill v. Franklin Fire Ins. Co.*, 80 Pa. Super. Ct. 492, 494 (1923) (stating "[i]t is a matter of common knowledge that the premium rate of insurance upon automobiles used for commercial purposes is higher than on cars used for pleasure. The obvious reason for this is the increased hazard.").

The Superior Court of Pennsylvania has interpreted the above-stated boilerplate "business pursuits" language in the context of a homeowners' insurance policy. In *Bullock*, the plaintiff was bitten by a dog at the defendants' home, where they conducted a business partnership known as "Kiddie Castle." The Pennsylvania Insurance Guaranty Association (PIGA) contended that the dog bite incident was covered by the separate homeowners' policies of the defendants. These homeowners' policies had been issued by two separate insurance companies. It was agreed that both policies contained

15

an exclusion for "bodily injury or property damage arising out of business pursuits of any insured except activities therein which are ordinarily incident to non-business activities." 457 A.2d at 1288. The Superior Court affirmed the trial court's finding that the business pursuits exclusion applied to the dog bite incident because "the liability in this case arose from a strictly business related endeavor . . . ." *Id.* at 1289 (quoting *Bullock v. Pariser*, 11 Pa. D. & C.3d 77, 82-83 (1979)).

The Court expressly rejected PIGA's argument that, "because the [child care] business can operate profitably with or without a guard dog, . . . the purchase and maintenance of a guard dog is not, itself, a business pursuit," stating that

> [w]e find this argument to be entirely unconvincing. The fact that a business might continue to make a profit in the absence of any number of activities conducted in furtherance of its interests does not prevent such activities from being "business pursuits." For example, a retail store may make a profit while employing only one salesperson, yet the hiring of a second salesperson is clearly a "business pursuit."

*Id.* at 1289. On the basis of this reasoning, the Court held that the defendants need not be in the "security dog" business in

16

order for the business pursuits exclusion of their homeowner's policies to apply.

Here Canal contends that, because Singh is neither in the truck leasing business (though in fact he undoubtedly is) nor the truck sales business (which he undoubtedly is not), the business uses exception cannot apply to his attempt to sell or trade the Tractor. The Superior Court of Pennsylvania, however, instructs that Mr. Singh need not be in either the truck leasing or truck sales business in order for the "business use" exclusion to apply. It is implicit in the language of *Bullock* that a "business pursuits" clause applies where the liability arises from a business-related endeavor and the activity in question is "conducted in furtherance of [the business'] interests . . . ." *Id.* at 1289. Similarly, Underwriters' "business uses" exception applies where the liability arises from any "business use" and the activity at issue promotes the business purposes of the insured.

In this case, these criteria are satisfied. The alleged liability arose from an endeavor – the possible trade or sale of a commercial vehicle – that was an exclusively business-related activity. Singh himself testified that the sole purpose of the trade or sale of the Tractor was to further or promote his business interests.[2] *See Sun Alliance Ins. Co. of Puerto Rico v.*

---

[2]In relevant part, Mr. Singh testified at his deposition as follows:

17

[Q] Why were you looking to trade in the truck?
[A] Because this truck required too much repair on it.  Spending – spent too much money on the engine.  So, I didn't want to spend anymore.
[Q]  How many miles were on the truck that day?
[A]  I don't remember.
[Q] Were you looking to trade in for a new truck?
[A] Yeah, a brand new truck.
[Q] Would that have cost less to maintain?
[A] Yeah.  When you drive to California back and forth – you have to have a good truck to run [sic] California back and forth.
[Q] What's that, over 3,000 miles each way?
[A] Yeah.  Because you have to – six, seven days back and forth from California.
[Q] Your arrangement with BIR at the time in April of 2000, did that arrangement include you paying for maintenance of your trucks?
[A] Yeah, I'm paying money.
[Q] Okay.
[A] Everything is mine.  They have to give me the load, BIR, that's it.  They don't have nothing else to do.   If something break down or something, if it break down . . . I have to pay for everything from my pocket.
[Q] Okay.   *So, it was a better business arrangement for you to have a new truck that would require less maintenance than it was to have the 1996 truck that required a lot of*

18

*Soto,* 836 F.2d 834 (3d Cir. 1988) (relying on the testimony of an insured in order to determine the coverage question against him).

Beyond *Bullock*, several decisions interpreting "business pursuits" exclusions under Pennsylvania law in non-trucking contexts counsel in favor of the conclusion that Underwriters' business use exclusion is unambiguous and applies here. One such case is *Travelers Indem. Co. v. Fantozzi*, 825 F. Supp. 80 (E.D. Pa. 1993). There, the insured parents and their minor son were sued after the son sexually molested a child whom the parents were babysitting. The parents' homeowner's policy excluded coverage for bodily injury "arising out of the business pursuits of any insured except those of a clerical office employee." *Id*. at 84-85. The policy defined "business" to include "trade, business or occupation." *Id*. at 85. In coming to its determination that the "business pursuits" exclusion was unambiguous, *id*. (citing *Myrtil v. Hartford Fire Ins. Co.*, 510 F. Supp. 1198, 1201 (E.D. Pa. 1981) (finding the same language "clearly not ambiguous")), the Court explained that where the applicability of a business pursuits exception is at issue in the Third Circuit, an activity encompassed within that exclusion requires two elements.

---

    *maintenance*.
    [A] *Yeah*.
(Emphases added.)

19

> The first is continuity, or customary engagement in the activity. The second, profit motive, may be shown by such activity as a means of livelihood, a means of earning a living, procuring subsistence or profit, commercial transactions or engagements.

*Sun Alliance Ins. Co.*, 836 F.2d at 836. The *Travelers* Court concluded that the continuity element was clearly satisfied: "The [defendant parents] took care of [the victim child] on a daily basis over the course of more than four years. Thus, the time of the babysitting services was neither irregular nor of limited duration." *Travelers Indem. Co.,* 825 F. Supp. at 85. Because "the [defendant parents] agreed to babysit on a full-time basis as a means of gaining temporary income while [the defendant dad] was laid off from his customary job" and there was "no dispute that the [defendants] were motivated by a desire for compensation," the Court further held that the babysitting services satisfied the profit motive element of the "business pursuits" exclusion. *Id*. As a result, the non-commercial homeowner's policy did not provide coverage for claims made by the victim child's family in the underlying tort action.

Underwriters' non-trucking liability policy similarly precludes coverage here. Singh's admitted purpose in trading or selling the Tractor was the furtherance of his personally owned and operated profit-making activity – leasing

20

commercial trucks to motor carriers. Moreover, Singh testified that he had operated that business on a continuous basis for approximately ten years. Because Singh's activity satisfies both prongs of the business pursuits exclusion test – profit motive and continuity – Underwriters' policy precludes coverage to Singh for claims made while he was engaged in that activity.

## B. *Reasonable Expectations of the Insured*

Canal further argues that "the great weight of authority in Pennsylvania strongly favors a conclusion that the Pennsylvania Supreme Court would in this case permit the reasonable expectations of the insured to be relied on to determine whether facially unclear insurance policy language is ambiguous, and further find such ambiguity to preclude exclusion and favor coverage of Mr. Singh." Aplt. App. at 26. Specifically, Canal claims that Singh reasonably expected the business use exclusion to apply only to acts related to or furthering the business of a commercial carrier, not to acts related to selling or trading the Tractor. *Id*. at 19. Because Underwriters' construction of its exclusionary language is contrary to the reasonable expectations of the insured, Canal contends that the language is ambiguous and should be interpreted in favor of Singh. Relying on *Matcon Diamond v. Pennsylvania Nat'l Ins. Co.*, 815 A.2d 1109, 1114 (Pa. Super. Ct. 2003), the District Court here disagreed, explaining that it is well settled in Pennsylvania that the reasonable expectations doctrine does not provide relief where the language of the

contract is clear and unambiguous:

> Canal also argues that Underwriters' position is precluded by the doctrine of "reasonable expectations of the insured" as that doctrine has developed under Pennsylvania law. The Court disagrees. The Supreme Court of Pennsylvania has held that the "polestar" for determining the parties' intent is the language of the policy itself. To that end, the Superior Court of Pennsylvania has noted that, "generally, courts cannot invoke the reasonable expectation doctrine to create an ambiguity where the policy itself is unambiguous." As recognized by the *Matcon* court, the highest court in Pennsylvania has limited the argument that the reasonable expectations of the insured trump the clear and unambiguous language of a policy to two occasions: (1) protecting non-commercial insureds from policy terms which are not readily apparent; and (2) protecting non-commercial insureds from deception by insurance agents.

*Canal Ins. Co.*, 333 F. Supp. 2d at 356-57 (internal citations omitted). The Court expressly declined Canal's invitation to look beyond the "plain and unambiguous language of the policy in order to scrutinize what Mr. Singh's expectations may have

22

been regarding coverage" because Canal "advanced no argument that Underwriters' policy terms were not readily apparent or that there was deception by the insurance agents." *Id*. at 357.

Our Court recently weighed in on the Pennsylvania reasonable expectations doctrine, stating that

> Pennsylvania case law . . . dictates that the proper focus for determining issues of Insurance coverage is the reasonable expectations of the insured. In most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations. Courts, however, must examine the totality of the insurance transaction involved to ascertain the reasonable expectations of the insured. As a result, even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage. However, this aspect of the doctrine is only applied "in very limited circumstances" to protect non-commercial insureds from policy terms not readily apparent and from insurer deception. Absent sufficient justification, however, an insured may not complain that his or her reasonable expectations were frustrated

23

> by policy limitations that are clear and unambiguous.

*Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 344 (3d Cir. 2005) (internal citations and quotations omitted).  In this context, the District Court's refusal to look beyond the plain meaning of the unambiguous exclusionary language to Singh's reasonable expectations is consistent with the interpretation of Pennsylvania case law in our Circuit.

**C.  *Public Policy Considerations***

Canal further argues that Underwriters' exclusionary language violates Pennsylvania public policy ensuring adequate insurance is available to parties injured in motor vehicle accidents because (1) enormous gaps between non-trucking and commercial liability trucking insurance may exist as a result of the exclusion, and (2) the exclusion is in conflict with the Motor Vehicle Financial Responsibility Law (MVFRL), 75 Pa. Cons. Stat. § 1701 *et seq*.  Underwriters contends that in cases examining the ambiguity of insurance policy terms, *i.e.*, cases where the issue is one of contract interpretation, the Pennsylvania Supreme Court has held that public policy arguments are irrelevant.

24

Relying on *Madison*, 735 A.2d at 108 n.7,[3] Pennsylvania courts repeatedly have stated "when the question is one of contract interpretation, public policy arguments are irrelevant." *Matcon Diamond*, 815 A.2d at 1112; *Wagner v. Erie Ins. Co.*, 801 A.2d 1226, 1231 (Pa. Super. Ct. 2002); *Municipality of Mt. Lebanon v. Reliance Ins. Co.*, 778 A.2d 1228, 1232 (Pa. Super. Ct. 2001). In *Madison*, the Pennsylvania Supreme Court instructed that "[t]he court's only aim [in a contract interpretation case is] to ascertain the intent of the parties as manifested by the language of the written instrument." 735 A.2d at 108. Immediately thereafter, it dropped a footnote stating that

> [t]he same principle precludes consideration of the public policy arguments advanced by Madison and its amicus. There is no claim of unconscionability before us. The question to be decided, therefore, is not whether the insurance industry should be allowed to issue commercial general liability policies containing the absolute pollution exclusion clause. That question is a matter for the legislature and the Insurance

---

[3]Both *Matcon Diamond* and *Reliance Ins. Co.* cite *Madison* at footnote 8 for the proposition that when the question is one of contract interpretation, public policy arguments are irrelevant. Language to this effect in *Madison* is actually found in footnote 7 of the opinion. *See Madison*, 735 A.2d at 108 n.7.

Commissioner of the Commonwealth. The pertinent question is, rather, whether such clause, contained in the contract of insurance entered into between Madison and Harleysville, by its terms operates to relieve Harleysville of its obligation to defend Madison in the underlying personal injury action. That is a matter for judicial resolution in accordance with accepted principles of contract interpretation.

*Id*. at n.7.

The same analysis necessarily applies here. Canal advances no argument that Underwriters' exclusion is unconscionable. Therefore, the question is not whether the insurance industry should be allowed to issue non-trucking liability policies containing extremely broad business use exclusion clauses. Rather, it is whether the business use exclusionary clause by its terms operated to relieve Underwriters of its obligation to indemnify Singh in the Espenshade suit.

The District Court did not address whether Canal's public policy arguments were relevant. Instead, the Court stated:

[Canal] also argues that public policy supports its argument that the phrase is ambiguous. For

26

this proposition, [Canal] cites *Lincoln General Ins. v. Liberty Mut. Ins. Co.*, 804 A.2d 661 (Pa. Super. Ct. 2002) and *Connecticut Indemnity Co. v. Stringfellow*, 956 F. Supp. 553 (M.D. Pa. 1997). The Court will assume that indeed there is a public policy to ensure a source of compensation for injured parties when a lease agreement, common in the trucking industry, might create confusion over who would be responsible for accidents. However, there are statutory and regulatory mandates, such as those discussed in *Prestige Casualty*, 99 F.3d at 1342[,] and *Carolina Casualty Ins. Co. v. Ins. Co. Of North America*, 595 F.2d 128, 134-35 (3d Cir. 1979)[,] in place in recognition of this policy. Moreover, given that the injured parties in this case have already been compensated, the public policy favoring compensation has been vindicated.

333 F. Supp. 2d at 357 n.5. The Court is correct that public policy ensures a source of compensation for injured parties when a lease agreement might lead to a gap in coverage and statutory and regulatory mandates are in place that demand the provision of such compensation. Pursuant to 49 U.S.C. §§ 13906(a)(1), 31139(b)(2) and 49 C.F.R. § 387 (the federal statutory and regulatory provisions discussed in *Prestige Casualty* and *Carolina Casualty*), an MCS-90 endorsement

27

must accompany any liability policy issued to a registered motor carrier.[4]    Indeed, Canal concedes that the mandatory

---

[4]The MCS-90 endorsement is a federally required form endorsement which states that commercial liability insurers, such as Canal, must pay any "final judgment" recovered against the insured for public liability resulting from negligence in the operation, maintenance, or use of motor vehicles subject to financial responsibility requirements of the Motor Vehicle Act regardless whether the vehicle is described in the policy. Should a commercial liability insurer fail to pay any final judgment rendered against its insured, it becomes personally responsible for the judgment.  *See* Aplt. App. at 50.  The MCS-90 endorsement in our case states:

> In consideration of the premium stated in the policy to which this endorsement is     attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless whether each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere . . . .
> It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other

> endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. . . .  The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in the endorsement.
>
> It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

*Id*.  The MCS-90 endorsement is, in effect, suretyship by the insurance carrier to protect the public – a.k.a. a safety net. *T.H.E. Ins. Co. v. Larsen Intermodal Servs., Inc.*, 242 F.3d 667, 672 (5th Cir. 2001) (noting that "[t]he First Circuit has aptly described the obligation placed upon the insurer by the MCS-90 as one of suretyship").  Thus, an insurer's responsibilities under the endorsement are triggered when the policy to which it is attached does not provide coverage to the insured.  The peculiar nature of the MCS-90 endorsement grants the judgment creditor the right to demand payment directly from the insurer, and simultaneously grants the insurer the right to demand

MCS-90 endorsement accompanying its policy with BIR required it to indemnify and defend BIR in the Espenshade suit. Moreover, the undisputed fact that the parties injured in this case have been compensated counsels against any argument that a ruling in favor of no coverage on the basis of a business use exclusion in a non-trucking policy severely undermines the long-standing public policy favoring victim compensation. Canal is correct, however, that if its insurance policy does not apply to Singh's trucking activity at the time of the Espenshade suit, there is a broad gap of coverage here because, under those circumstances, neither Canal nor Underwriters was obligated to defend or indemnify Singh. The question then becomes whether such a gap in coverage offends Pennsylvania public policy.

As mentioned at the beginning of this section, Canal contends that Underwriters' business use exclusion offends public policy because it conflicts with the MVFRL. Specifically, Canal claims that Underwriters' exclusion is in tension with the MVFRL because it "is in place to ensure that adequate liability coverage is maintained on all vehicles driven within this Commonwealth so as to protect innocent Pennsylvania residents who become victims of motor vehicle accidents" and "the very purpose of non-trucking insurance is to provide independent owner-operators . . . adequate insurance coverage to ensure compensation for such victims of motor

---

reimbursement from the insured.

vehicle accidents involving tractors and trailers not being used for commercial purposes related to the motor carrier's business at the time of the accident." Aplt App. at 42-43. Under Pennsylvania law, stipulations in a contract of insurance in conflict with, or repugnant to, statutory provisions that are applicable to, and consequently form a part of, the contract must yield to the statute, and are invalid, since contracts cannot change existing statutory laws. *Prudential Property and Cas. Ins. Co. v. Colbert*, 813 A.2d 747 (Pa. 2002).

The MVFRL requires that every insurance policy issued in Pennsylvania include underinsurance motorist coverage unless it is rejected by the insured. *Allwein v. Donegal Mutual Ins. Co.*, 671 A.2d 744, 756 (Pa. Super. Ct. 1996). Simply stated, the statute requires insurance companies to offer underinsurance coverage to its insured, which its insureds can reject. *Id.* (Under the MVFRL, "insurers . . . must *offer* underinsurance to their insureds; they do not have to *provide* underinsurance.") (emphasis in original). Pertaining to the public policy concerns of the MVFRL, the Pennsylvania Supreme Court has stated that

> [t]he repeal of the No-Fault Act . . . and the enactment of the MVFRL reflected a legislative concern for the spiraling consumer cost of automobile insurance and the resultant increase in the number of uninsured motorists driving on public highways. The legislative concern for

31

the increasing cost of insurance is the public policy that is to be advanced by statutory interpretation of the MVFRL. This reflects the General Assembly's departure from the principle of "maximum feasible restoration" embodied in the now defunct No-Fault Act.

*Burstein v. Prudential Property and Cas. Ins. Co.*, 809 A.2d 204, 207 (Pa. 2002). The Court went on to say that "[i]ndeed, the Legislature's concern for the increasing cost of automobile insurance and the parallel aim of cost containment are easily gleaned from the legislative history of the MVFRL." *Id.* While the Court recognized "that other public policies may underlie the MVFRL, the legislative concern for the spiraling consumer cost of automobile insurance is its dominant and overarching public policy." *Id.* at 207 n.4. Because Pennsylvania's Supreme Court points out that the purpose of MVFRL is to control the cost of consumer auto insurance, not "maximum feasible restoration" to accident victims, Canal's submission that any gap in insurance coverage created by Underwriters' business use exclusion conflicts with MVFRL is unpersuasive. This is because

> [p]ublic policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found *definite indications in the*

32

*law* of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action. *In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy*. The courts must be content to await legislative action.

*Id*. at 207 (quoting *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998)) (emphases added); *see also Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994). Given that (1) controlling state case law indicates that public policy considerations do not apply here because this is a case of contract interpretation, *Madison*, 735 A.2d at 108 n.7, (2) there are no uncompensated victims here, *cf. Paylor v. Hartford Ins. Co.*, 640 A.2d 1234, 1240 (Pa. 1994) (stating application of public policy concerns in determining the validity of an insurance exclusion depends on the factual circumstances presented in each case), and (3) Canal has pointed to no state or federal statute that is offended by the potential gap in coverage due to Underwriters' exclusion, the gap created by Underwriters' broad exclusionary language is a matter for the Pennsylvania legislature.

\* \* \* \* \*

33

For the reasons explained above, we affirm the District Court's ruling that Underwriters' broad "business use" exclusionary language, which prohibits "any use of the covered auto that promotes the business purpose of the [i]nsured," unambiguously denies coverage to Singh for liability arising from the Espenshade accident. We also affirm the District Court's determinations that neither the doctrine of reasonable expectations nor Pennsylvania public policy make Underwriters liable for the accident.